355 F.Supp.2d 991 (2005)
Linda S. HAMILTON, Plaintiff,
v.
Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.
No. 4:03CV775ERW.
United States District Court, E.D. Missouri, Eastern Division.
January 10, 2005.
*993 Jeffrey J. Bunten, St. Louis, MO, for Plaintiff.
Raymond W. Gruender, III, Office of U.S. Attorney, St. Louis, MO, for Defendant.

REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
NOCE, United States Magistrate Judge.
This action is before the court for judicial review of the final decision of the *994 defendant Commissioner of Social Security denying the application of plaintiff Linda S. Hamilton for disability benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and for supplemental security income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. The action was referred to the undersigned United States Magistrate Judge for a recommended disposition under 28 U.S.C. § 636(b).

I. BACKGROUND

A. Plaintiffs Application and Medical Records
In October 2001, plaintiff filed her application for disability and SSI benefits, alleging she became disabled on November 26, 2000, at age 54. Plaintiff states she is unable to engage in substantial, gainful employment due to chronic pain. (Tr. 48, 67, 95.)
The record indicates that plaintiff worked from 1985 to August 2001. Her most recent employment was as a restaurant server, beginning in January 2000. Prior to this position, plaintiff worked as a secretary, a route relief driver, and an electronics tester. (Tr. 81-86.)
In a claimant questionnaire, plaintiff states she has pain in the groin area, hips, and back, which "is getting more intense." Plaintiff reports that she experiences this pain every hour of every day, made worse when bending, walking, and lifting. To relieve this pain, plaintiff reports she stays in bed, with moderately effective results. Plaintiff reports she is prescribed Hydrocodone [1] for pain. She does not take this medication as prescribed, because she lacks health insurance and cannot afford refills. (Tr. 63.)
With respect to activities of daily living, plaintiff states she can do laundry (with assistance carrying the laundry) and dishes (with the use of a wheelchair), and clean the bathroom. Plaintiff reports she can dp limited grocery shopping, and needs assistance carrying the groceries to and from the car. Plaintiff said she can prepare any meals if sitting in her wheelchair, but only simple or prepared food if she is standing. Plaintiff has difficulty bathing, putting on her shoes, and sleeping, due to pain. She states her impairment has slowed her down a lot, and she has difficulty sleeping. (Tr. 64-65.)
Plaintiff reports she likes to use the computer, watch television, and read the newspaper, but has difficulty concentrating when she reads, due to the pain. Plaintiff states she is in too much pain to leave the house often, or enjoy time with family and friends, as she did previously. Additionally, plaintiff reports it is painful for her to drive, and she only drives to the grocery store once a week. She states that she "feeds" her husband and two cats, cooking only two meals a week for her husband. She does not engage in outside activities, but only sits at home depressed. (Tr. 65-66.)
Plaintiff reports her pain has been constant since November 26, 2000. She cannot stand for more than twenty minutes, and needs to use a raised toilet seat when using the restroom. Medication and rest do not relieve her pain. (Tr. 67.)
As early as September 19, 1996, plaintiff reported hip pain. At that time, x-rays were normal and she was given anti-inflammatory medication and encouraged to attend physical therapy. On October 28, 1996, plaintiff was given an injection for right hip pain, and was diagnosed with *995 trochanter bursitis. On June 10, 1997, plaintiff reported pain in her left knee. She was given a knee injection and prescribed an exercise regimen. X-rays were essentially normal. On January 23, 1998, plaintiff again complained of right hip pain. (Tr. 155-56.)
On March 26, 1998, plaintiff was informed by the office of J.T. Hilgeman, M.D., that an MRI of the cervical spine revealed a mild disc bulge, mild degenerative changes, and no disc compression. Plaintiff requested a refill of anti-inflammatory medication, saying it worked very well. On July 13, 1998, plaintiff complained to Dr. Hilgeman of right hip pain upon bending, twisting, and rotating. (Tr. 118, 120.)
On July 26, 2000, plaintiff was examined by Craig E. Aubuchon, M.D., for pain in her right buttock, foot, and knee. An examination revealed non-tender range of motion of her hip, a negative straight leg raise, a benign knee, and mild tenderness of the foot. Plaintiff reported being asymptomatic at the examination. She was given anti-inflammatories and a prescription for physical therapy. On August 28, 2000, plaintiff complained of pain in the right hip, right knee, and foot. She was given injections in all three areas. (Tr. 151-152.)
On November 21, 2000, plaintiff was examined by Dr. Hilgeman due to severe pain in the right hip, groin, and knee. Plaintiff reported pain on rotation of the hip or straight leg raise that had worsened over the past few weeks. Dr. Hilgeman opined that plaintiff may have avascular necrosis (AVN) or degenerative arthritis of her right hip. He ordered x-rays, blood flow studies, and prescribed Vicodin[2] and prednisone[3]. The blood flow study revealed no deep vein thrombosis or phlebitis. Plaintiff underwent a diagnostic examination of her pelvis and right hip. This revealed an "osteoarthritic change of the pubic symphysis." This finding was slightly more progressed than a similar study completed on July 26, 1996. (Tr. 109-112, 114.)
On December 1, 2000, plaintiff saw Wade Hammond, M.D. Dr. Hammond noted plaintiff had an almost five year history complaining of hip pain, with increasing difficulty working as a food server because of such pain. He further noted plaintiff was taking Ultram[4] and Indocin,[5] but that medications did not seem to be of benefit. Examination revealed no leg length discrepancy, and intact neurovascular status, but plaintiff reported groin pain with rotation or abduction of the right hip. In reviewing previous x-rays. Dr. Hammond noted narrowing of the joint space on the right side, marginal osteophytes on the right femoral head, and a small cystic defect also on the femoral head. Dr. Hammond believed these observations could be indicative of AVN or degenerative arthritis. Additionally, Dr. Hammond addressed plaintiffs knee pain. He noted no *996 visible deformity, intact neurovascular status, a negative Lachman's test, and some joint line tenderness and knee pain on rotation. Dr. Hammond recommended an MRI of the hip, and discussed the possibility that she would need a hip replacement in the future. It was Dr. Hammond's opinion plaintiffs knee complaints were not of sufficient severity to warrant an MRI. (Tr. 175-76.)
A December 8, 2000, MRI showed right hip joint effusion, but was otherwise normal. On December 11, 2000, plaintiff complained of hip pain such that she could barely walk. She was advised to see Dr. Hammond for a consultation. On December 22, 2000, plaintiff saw Dr. Hammond after being admitted to the hospital for evaluation of her hip pain. Examination revealed severe pain in "the right hip and groin area with any active or passive movement of the right lower extremity." Dr. Hammond ordered an evaluation, to include hip joint aspiration. On December 23, 2000, plaintiff underwent a fluoroscope of the hip for culture. The culture was normal. (Tr. 107, 160-62, 171-72.)
On January 15, 2001, Dr. Hammond recommended to plaintiff that she undergo hip replacement arthroplasty. On January 30, 2001, plaintiff underwent a total right hip replacement. Plaintiff tolerated the surgery well, met all physical therapy goals, and reported less pain. On February 5, plaintiff was discharged from the hospital, with a prescription for pain medication. (Tr. 130-32, 137, 139, 171.)
On February 9, plaintiff underwent a follow-up examination with Dr. Hammond. Plaintiff reported the pain was improving and she was "getting around increasingly well." It was recommended that plaintiff obtain a shoe lift, as the right lower extremity was 1/8 to 1/4 of an inch shorter than the left. Plaintiff was advised to upgrade her activity level, move toward using a cane, and limit her use of pain medication. Home health records from the period of February 6-21 indicate plaintiff reported her pain typically at a 4 out of 10, with her pain at a 10 just after discharge. (Tr. 170, 204-11.)
On March 23, plaintiff returned to Dr. Hammond for a follow-up visit. She reported marked improvement in pain, only using pain medication (Vicodin) sparingly, and walking without a limp. On June 5, plaintiff again saw Dr. Hammond. Upon examination, she reported pain and cramping in her right groin area. X-rays indicated her hip arthroplasty was in good position with no reportable problems. Dr. Hammond believed her symptoms indicated an abductor spasm, and recommended stretching exercises. (Tr. 168-69.)
On October 15, plaintiff saw John Clohisy, M.D., reporting pain in her right hip, with major pain upon light touch. Dr. Clohisy referred plaintiff for pain management, and for laboratory tests to rule out infection. Laboratory tests were normal. Dr. Clohisy could not determine the cause of her pain. On November 13, Dr. Clohisy provided plaintiff with a "Statement of Patient Disability," reporting that plaintiff was "unable to do anything that causes the hip to move or that puts pressure on the hip." (Tr. 145-48.)
On November 19, non-examining provider Anver Tayob, M.D., completed a Physical Residual Functional Capacity Assessment (RFC). Dr. Tayob noted no manipulative, visual, communicative, or environmental limitations. Dr. Tayob stated plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk at least 2 hours in an 8 hour day, sit for about 6 hours in an 8 hour day, and could engage in unlimited pushing or pulling. With respect to postural limitations, Dr. Tayob opined that plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. Dr. Tayob referred to *997 Dr. Clohisy's statement that plaintiff was unable to engage in anything causing the hip to move or putting pressure on the hip, absent any supporting clinical data or narrative. In Dr. Tayob's opinion, this statement, at face value, "would preclude any walking or sitting." Dr. Tayob further reasoned that "Claimant's ADLs far exceed these ... limitations." (Tr. 73-77, 80.)
Dr. Tayob noted that while plaintiff reports pain in her hip every hour of every day, Dr. Hammond's treatment notes indicate plaintiff showed marked pain relief following the hip replacement surgery. Moreover, Dr. Tayob believed that plaintiffs ability to do laundry, do dishes, clean the bathroom, grocery shop, drive, and take care of her cats and her husband made her allegations of pain only partially credible. Dr. Tayob noted the inconsistency between Dr. Clohisy's assessment and Dr. Hammond's treatment records, which noted no abnormalities and evidenced marked improvement in pain. (Tr. 78-79.)
On January 23, 2002, plaintiff was seen in consultation with Robert T. Trousdale, M.D., at the Mayo Clinic, for continued groin, buttocks, and hip pain. Plaintiff also complained of previous knee pain, which was improving. Examination revealed that plaintiff walked with a stifflegged gait, and was "exquisitely tender" in the hip area upon touch and range of motion. Plaintiff exhibited easy flexion to 95 degrees, external rotation 30, internal rotation 10, abduction 30, and adduction 20. Dr. Trousdale suspected plaintiffs pain was from bursitis and gait abnormality. He recommended x-rays in one year, pain management, physical therapy, and gait retraining. He believed no surgical procedure would solve plaintiffs complaints of pain. (Tr. 164.)
On May 22, plaintiff again saw Dr. Hammond, this time for knee pain and swelling, with no known trauma. Dr. Hammond noted plaintiff went to the Mayo Clinic earlier in 2002 and was told her hip "looked good" and that perhaps her pain was due to muscle strain or bursitis. Dr. Hammond noted further that her hip problem appeared to be improved. Examination of the knee revealed "no effusion, redness, heat, swelling, ecchymosis, induration or edema," but was positive for pain on palpation and rotation. A neurological examination was essentially normal, and xrays of the left knee showed mild degenerative changes. Dr. Hammond was not able to discern what was causing plaintiffs knee problems, noting perhaps she had an internal derangement. She was given a corticosteroid injection and told to return if symptoms persisted. (Tr. 252-53.)
On June 6, Dr. Hammond wrote a "To Whom It May Concern" letter regarding plaintiffs knee pain. He noted she was unable to walk for more than brief distances and was "certainly unable to work." Dr. Hammond stated that plaintiff would undergo "a diagnostic arthroscopy and debridement of the left knee." He suspected she had a torn meniscus cartilage, and, if so, "with appropriate convalescence and rehabilitation she should be able to return to work." At the time the letter was written, however, it was Dr. Hammond's opinion that plaintiff was "totally disabled from carrying out her usual work activities." (Tr. 251.)
On November 4, Dr. Hammond completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)." He reported plaintiff was limited to only occasionally lifting 20 pounds, and frequently lifting 10 pounds. Plaintiff could stand 1-2 hours in an 8 hour workday, with 30 minutes of standing or walking without interruption. Plaintiff had no sitting restrictions, could occasionally climb, crouch and kneel, could frequently balance, but could never crawl. Plaintiff had no *998 restrictions with regard to reaching, handling, feeling, pushing, pulling, seeing, hearing, or speaking. Plaintiff did not require limited exposure to heights, moving machinery, extreme temperatures, chemicals, dust, noise, fumes, humidity, or vibration. Dr. Hammond opined that plaintiff was "unable to perform activities requiring prolonged standing, walking, climbing, kneeling or squatting." (Tr. 248-50.)
On December 4, the ALJ referred plaintiff to Paul W. Rexroat, Ph.D., for a psychological evaluation. During the interview, plaintiff exhibited normal emotions, affect, and energy level. She was alert and oriented. Her speech was normal, coherent, and relevant. Plaintiff walked slowly, with a cane, and appeared to experience discomfort sitting during the interview. Plaintiff reported being depressed, and having suicidal ideas in August 2001, with occasional thoughts of suicide since that time. Plaintiff did not exhibit paranoia, hallucinations, or delusions. Plaintiffs cognitive status appeared to be normal, and Dr. Rexroat estimated she functioned in the low-average intelligence range. Dr. Rexroat found no functional or social limitations, or deficiencies in concentration, persistence, pace, and memory. With respect to activities of daily living, plaintiff reported she does the majority of the cooking, cleaning, and laundry, and watches television in her free time. (Tr. 177-80.)
Dr. Rexroat diagnosed plaintiff as having major depressionrecurrent, physical disorders and conditions (from the medical records), "[occupational problems (unemployed)!;,]" and an overall Global Assessment of Functioning (GAF) of 70.[6] His overall prognosis was guarded. (Tr. 180.)
On December 6, Dr. Rexroat completed a "Medical Source Statement of Ability to do Work-Related Activities (Mental)." He noted no deficiency in plaintiffs ability to understand, remember, and carry out instructions. He found a slight difficulty in interacting with the public, interacting with a supervisor, interacting with coworkers and responding appropriately to changes in the work setting, with moderate difficulty responding appropriately to work pressures, due to depression. He noted plaintiff had no additional impairments due to her condition. (Tr. 180-82.)

B. Plaintiffs Hearing Testimony
The ALJ conducted a hearing on October 22, 2002, at which plaintiff was represented by counsel. Plaintiff testified she lives in a home with her husband, who owns a moving and storage company. Plaintiff completed high school and can read and write; but she has "a little" difficulty with math. Plaintiff testified she has gained twenty pounds since November 2000 due to inactivity. (Tr. 271-73.)
With regard to previous employment, plaintiff testified she last worked in August 2001, as a catalog operator. After two weeks, she was fired because she "wasn't picking up fast enough." Prior to this position, plaintiff worked as a waitress for eleven and a half years. In the past fifteen years, plaintiff has also worked as a relief driver, an assembler, and an electronics tester. Plaintiff testified she believes she is not able to work because of chronic pain in her hip, knee, groin, and lower back. Plaintiff said she had a hip replacement in January 2001, will require knee surgery, and walks with the assistance *999 of a cane since the hip surgery. (Tr. 273-75.)
With respect to activities of daily living, plaintiff reported that on a typical day she makes coffee and sits in her recliner. She then goes back to bed and gets up between 11:30 and 12:00, to have some toast or scrambled eggs and watch television. Plaintiff then will go back to bed. On the days she cooks supper, plaintiff will do so and then go back to bed. (Tr. 287-88.)
Plaintiff testified that her pain prevents her from standing more than 20 minutes; she can sit for no more than 45 minutes to an hour. Plaintiff testified she stays in bed at least 4 hours of a 10 hour waking period. When she is not in bed, she spends her time laying in a recliner. Additionally, she has difficulty showering, and she cannot bend, stoop, or squat, or reach high up, without pain. Plaintiff stated she has problems driving due to pain from prolonged sitting, and she also has difficulty walking because one leg is longer than the other. She does not get out to visit relatives, or belong to any church or social group. She must use a special seat she obtained from the hospital to use the restroom, and she has great difficulty putting on socks. Plaintiff stated she does not read because she cannot concentrate due to the pain, and she cannot sit through a movie without having to lie down. She testified she engages in no outdoor activities. She has difficulty sleeping, and estimates she sleeps 4 to 6 hours a night. (Tr. 276-82.)
With respect to housework, plaintiff testified she can do the dishes and a little dusting. Plaintiff can cook; however, if she needs to stand for any length of time, she has to sit in her wheelchair. Plaintiff testified she cooks only twice a week. Plaintiff can do light grocery shopping every two weeks, with her husband doing "the major grocery shopping, the heavy stuff." (Tr. 281-82, 285.)
Plaintiff testified she has a history of depression, and was suicidal the prior summer. Plaintiff testified she cries about three times a month, and she stays in her bedclothes all day. Plaintiff said her pain and loss of her earlier lifestyle have caused her depression. (Tr. 282-83.)
Plaintiff testified that she does not have any health insurance, and has to borrow money to pay her health bills. Subsequently, she is not taking any pain medication due to the cost, and because "they really don't do that much good." Plaintiff said she would have to take two to three Vicodin every four hours for relief. She does not take any over-the-counter pain medication, except Tylenol for headaches, and she attempts to relieve her pain by laying down in bed or the recliner, and using heating pads and ice packs. Plaintiff has not been treated for depression or suicidal ideation. She smokes one pack of cigarettes daily. (Tr. 278, 283-85.)

C. The ALJ's Decision
In a March 20, 2003, decision denying benefits, the ALJ determined plaintiff is not disabled as defined by the Social Security Act. The ALJ found that plaintiff suffers from chronic left knee strain, majordepression, and the results of right hip replacement. (Tr. 17.) He determined
that the claimant's physical impairments are severe, as defined in Social Security Ruling 85-28, since they are more than slight abnormalities having more than a minimal effect on the ability to work, but that they do not meet or equal in duration or severity the criteria established under the appropriate listings in Appendix I, Part 404, Subpart P.
(Tr. 11-12.)
The ALJ found plaintiffs allegations are not fully credible. He noted that, while plaintiff complains of severe and disabling pain, she failed to attend follow-up appointments, *1000 she reported improvement in her pain, her medical testing was essentially normal, she was non-compliant with prescribed treatment, her treating providers proffered inconsistent medical opinions, and she did not seek regular treatment for her conditions. (Tr. 12-16.)
With respect to activities of daily living, the ALJ noted plaintiff
prepares meals, drives an automobile, dusts furniture, goes grocery shopping, washes dishes and watches television. The claimant indicated in the application that she did laundry (with help), picked up her mail daily, went to the store weekly and took care of her husband and two cats. Although minimal activities do not show an ability to engage in substantial gainful activity on a day to day basis, the claimant's daily activities may be considered as part of an overall assessment of credibility. The claimant's activities are considered to be more than minimal and indicate that the claimant has mental and physical stamina, the ability to concentrate and the ability to use her arms and legs. The claimant's activities are consistent with the ability to perform sedentary work.
(Tr. 15.)
Based on all relevant evidence, the ALJ concluded plaintiff has the ability to engage in employment, "except for frequently lifting over ten pounds, occasionally lifting over twenty pounds or standing and walking more than two hours in an eighthour workday[,]" and has no non-exertional limitations. Ultimately, the ALJ determined plaintiff could return to her past, relevant work as a secretary or an electronics tester. (Tr. 17.)

D. Background and Medical InformationPost ALJ Decision
On April 3, 2003, plaintiff wrote a letter for consideration by the Appeals Council which made plaintiffs letter a part of the record. (Tr. 6.) In this letter, plaintiff responded, paragraph by paragraph, to the ALJ's opinion. In most relevant part, plaintiff stated that it "was absurd" for Dr. Clohisy to recommend pain management, because plaintiff "didn't need to know how to live with pain, [she] needed to know what was causing it." Plaintiff further stated that she does take strong pain medication, having taken Vicodin "since day one[,]" as well as taking over-the-counter analgesics. Moreover, plaintiff states she is trying to quit smoking, and is down to 4-5 packs a week. (Tr. 260-64.)
With respect to her medical condition, plaintiff stated that Dr. Hammond never saw her walk, and therefore, was unable to give an adequate assessment of her gait. (Tr. 261.) Plaintiff further stated that she complained often to Dr. Hammond about her hip and groin pain, and he did nothing to help her. Plaintiff asserted she attended gait retraining as suggested by Dr. Trousdale, and that she did not follow-up with Dr. Trousdale, because she could do so with a physician in St. Louis. Plaintiff stated further that Dr. Hammond told her on May 22, 2002, that she needed arthroscopic surgery on her left knee for torn cartilage, and that he reiterated this recommendation at an April 1, 2003 examination. (Tr. 261-62, 164.)
Regarding her previous employment, plaintiff stated that her work as a "secretary" was in title only, with minimal data entry duties, and was limited basically to filing and answering the phones. Plaintiff believed she could not "pass as a true secretary." Plaintiff stated that she has minimal skills and education, and has "no clue what type of sedentary work [she] could do." Plaintiff reported her husband's take home pay is $300.00 per week, characterizing this as "not a lot of money for us to live on and keep paying out for all my medical bills." In the last portion of *1001 her letter, plaintiff stated she believes she is being discriminated against because she is "an American Indian." (Tr. 262-64.)
On April 6, 2003, Dr. Hammond completed a "Medical Opinion Re: Ability to do Work-Related Activities." He noted plaintiff could only occasionally, and frequently, lift less than 10 pounds, could stand or walk less than 2 hours in an 8 hour day, could sit about 6 hours in an 8 hour day, could sit 60 minutes without changing positions, could stand 20 minutes without changing positions, and must walk around every 30 minutes, for 5 minutes at a time. He further stated plaintiff requires the opportunity to shift at will from standing, sitting, or walking, and she could occasionally twist, stoop, crouch, and climb stairs and ladders. Plaintiff has no restrictions with respect to reaching, handling, fingering, feeling, pushing, or pulling. She does not need to limit exposure to extreme temperatures, wetness, humidity, or noise. Dr. Hammond noted plaintiffs condition limits her ability to kneel or crawl. He could not estimate how often plaintiffs condition may cause her to be absent from work. Dr. Hammond supported these limitations by referring to plaintiffs hip replacement and surgery, persistent pain, left knee pain and swelling, and probable torn meniscus. (Tr. 257-59.)
The Appeals Council declined further review. Hence, the ALJ's decision became the final decision of the defendant Commissioner subject to judicial review. (Tr. 3-6.)
In her appeal to this court, plaintiff argues that (1) the ALJ failed to properly consider her subjective complaints of pain, as required by Polaski v. Heckler, 739 F.2d 1320 (8th Cir.1984); (2) the ALJ failed to properly consider plaintiffs RFC; and (3) the ALJ incorrectly determined plaintiff could return to her past, relevant work.

II. DISCUSSION

A. General legal framework
The court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir.2002). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id.; accord Jones v. Barnhart, 335 F.3d 697, 698 (8th Cir.2003). In determining whether the evidence is substantial, the court must consider evidence that detracts from, as well as supports, the Commissioner's decision. See Brosnahan v. Barnhart, 336 F.3d 671, 675 (8th Cir.2003). So long as substantial evidence supports the final decision, the court may not reverse merely because opposing substantial evidence exists in the record or because the court would have decided the case differently. See Krogmeier, 294 F.3d at 1022.
To be entitled to benefits on account of disability, a claimant must prove that she is unable to perform any substantial gainful activity due to any medically determinable physical or mental impairment, which would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A) (2004). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. §§ 404.1520, 416.920 (2003); see also Bowen v. Yuckert, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (describing the framework); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir.2003). If the Commissioner can find that a claimant is or is not disabled at any step, a determination or decision is made and the next step is not reached. 20 C.F.R. § 404.1520(a)(4).

*1002 B. The ALJ's Credibility Determination
Plaintiff argues the ALJ failed to properly consider her subjective complaints of pain. Plaintiff contends the minimal daily activities the ALJ referred to are not legally sufficient to discredit her accounts of disabling pain. (Doc. 10 at 19-22.)
Assessing a claimant's credibility is primarily the ALJ's function. See Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003) (finding a claimant's credibility is primarily a matter for the ALJ to decide); Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir.2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."). In Singh v. Apfel, the Eighth Circuit held that an ALJ who rejects subjective complaints of pain must make an express credibility determination explaining the reasons for discrediting the complaints. Singh, 222 F.3d 448, 452 (8th Cir.2000).
The Eighth Circuit held in Polaski that an ALJ cannot reject subjective complaints of pain based solely on the lack of medical support, but instead must consider various factors. Polaski 739 F.2d at 1322. The factors include, in part, observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. Id.
Despite plaintiff's arguments, and evidence to the contrary, the ALJ made an adequate credibility determination supported by substantial evidence of record. The ALJ did not, as plaintiff suggests, reject her subjective complaints of pain simply based on her reported activities of daily living, contrary to Polaski but considered a multitude of factors including plaintiffs testimony and activities of daily living, medical reports, plaintiffs failure to take pain medication, and plaintiffs compliance with treatment. Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir.1997) ("The ALJ may discount subjective complaints of physical and mental health problems that are inconsistent with medical reports, daily activities, and other such evidence.").
By her own admission, plaintiff is able to engage in household chores and activities, including doing laundry (with lifting assistance), cleaning the bathroom, light dusting, preparing simple meals (preparing more involved meals while sitting), light grocery shopping, watching television, and taking care of animals. The ALJ found these to be more than minimal activities. See Pena v. Chater, 76 F.3d 906, 908 (8th Cir.1996) (affirming ALJ's discount of claimant's subjective complaints of pain where claimant was able to care for one of his children on a daily basis, drive car infrequently, and go grocery shopping occasionally). Moreover, plaintiff appears able to manage independently, as her husband is away from home approximately 15-20 days a month.
Regarding plaintiff's medical records, the ALJ specifically noted records evidencing that plaintiff reported marked improvement in pain after hip replacement surgery (and during the time she alleges disability), as well as repeated diagnostic tests showing normal artificial hip replacement, and failing to provide a reason for renewed reports of pain. Moreover, plaintiff did not consult a physician regarding any alleged hip pain subsequent to March 23 until October 15, the same month she filed for disability benefits. As late as May 2002, plaintiff reported her hip problems had improved. With regard to plaintiffs knee, the ALJ correctly noted that diagnostic examinations were essentially *1003 normal, and there is no evidence plaintiff continued to follow-up with providers for evaluation or corticosteroid injections. The ALJ noted also that there is no evidence in the record showing plaintiff attended a pain clinic, for assessment and treatment of her pain, as recommended by Drs. Trousdale and Clohisy.[7]Kelley v. Barnhart, 372 F.3d 958, 961 (8th Cir.2004) ("Infrequent treatment is also a basis for discounting a claimant's subjective complaints."); Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir.2001); Benskin v. Bowen, 830 F.2d 878, 884 (8th Cir.1987) ("The ALJ was certainly entitled to find [claimant's] failure to seek medical attention inconsistent with her complaints of pain.").
The ALJ considered further the fact that plaintiff did not take regular prescription pain medication, or over-the-counter preparations for her alleged disabling pain. Plaintiff reports she cannot afford such medications because she has limited financial resources, no health insurance since being unemployed, and that pain medications do not work well. Dover v. Bowen, 784 F.2d 335, 337 (8th Cir.1986) ("[T]he ALJ must consider a claimant's allegation that he has not sought medical treatment or used medications because of a lack of finances."); see also Hutsell v. Sullivan, 892 F.2d 747, 751 n. 2 (8th Cir.1989) ("It is for the ALJ in the first instance to determine a claimant's real motivation for failing to follow prescribed treatment or seek medical attention.").
The record shows that plaintiff was taking pain medication prior to, and after her surgery, to control pain. There is no indication that pain medication was ineffective at that time. In fact, plaintiff showed marked improvement and was told she should limit the amount of pain medication. Moreover, there is no evidence in the record to suggest plaintiff attempted to obtain low-cost pain medication or assistance, or was prevented from obtaining medication or care due to a lack of insurance or finances. The ALJ noted, however, that plaintiff was able to afford at least a pack a day tobacco habit. Osborne v. Barnhart, 316 F.3d 809, 812 (8th Cir.2003) (recognizing that a lack of funds may justify a failure to receive medical care; however, a plaintiffs case is buttressed by evidence he related an inability to afford prescriptions to his provider and was denied the prescription); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir.1999) ("Although [plaintiff] claims he could not afford such medication, there is no evidence to suggest that he sought any treatment offered to indigents or chose to forgo smoking three packs of cigarettes a day to help finance pain medication."); Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir.1992) (noting that financial hardships can be considered in determining whether to award benefits; however, that is not of itself determinative. The court found compelling that plaintiff presented no evidence she sought out low-cost medical treatment, or was denied treatment due to lack of finances).
Standing alone, the ALJ is correct that plaintiffs reported activities of daily living do not amount to substantial evidence. Taken in sum with plaintiffs level of functioning, medical records, inconsistent medical treatment, and failure to take pain medication without sufficient effort to overcome alleged financial inability, the *1004 ALJ's credibility determination is supported by substantial evidence of record.
Moreover, the relevant evidence the Appeals Council made part of the record after the hearing does little to challenge the ALJ's credibility determination. "In cases involving the submission of supplemental evidence subsequent to the ALJ's decision, the record includes that evidence submitted after the hearing and considered by the Appeals Council." Bergmann v. Apfel, 207 F.3d 1065, 1068 (8th Cir. 2000); Riley v. Shalala, 18 F.3d 619, 622 (8th Cir.1994) ("[The court] must speculate to some extent on how the administrative law judge would have weighed the newly submitted reports if they had been available for the original hearing.").
In the instant case, the additional evidence further belies plaintiffs credibility. At the hearing, and under oath, plaintiff said she does not take any pain medication because she cannot afford it, and only takes over-the-counter preparations for headaches. However, in response to the ALJ's adverse determination, plaintiff states that she does take Vicodin, has taken it all along, and intersperses it with over-the-counter medications. Moreover, plaintiff suggests that Dr. Hammond told her she required knee surgery for torn cartilage at her May 22, 2002 examination. Treatment records from that office visit do not state any such recommendation. In his letter dated June 2002, Dr. Hammond referred to a diagnostic arthroscopy and debridement, as well as stating that plaintiff has a possible torn meniscus. He states, further, that plaintiff should be able to return to work with rest and rehabilitation, with no mention of any debilitating knee surgery. Plaintiff also suggests that she saw Dr. Hammond on April 1, 2003, and he again reiterated the need for surgery. The record does not reflect this visit, and there is no indication plaintiff attempted to provide the Appeals Council with any report, this despite supplying the Council with reports from Dr. Hammond of the same time period.
Ultimately, having to weigh the evidence as the ALJ would have, the undersigned finds the evidence does not detract from the ALJ's credibility determination. See Ply v. Massanari, 251 F.3d 777, 779 (8th Cir.2001) (noting a claimant's inconsistent statements as a factor to consider in determining claimant's credibility).
As plaintiff suggests, the record does reveal some evidence supporting plaintiffs claims of disabling pain. This evidence is not, however, so overwhelming as to minimize substantial, contrary evidence the ALJ relied upon in forming his decision. Moreover, it is not the province of this court to re-weigh the evidence as it existed before the ALJ. See Krogmeier, 294 F.3d at 1022 (stating as long as there is substantial evidence in the record, the ALJ's decision will be upheld even if substantial evidence exists adverse to the ALJ's findings); Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir.1990) ("ALJs must seriously consider a claimant's testimony about pain, even when ... subjective. But questions of credibility are for the trier of fact in the first instance. If an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, we will normally defer to that judgment."); cf. Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir.1987) ("The question is not whether [plaintiff] suffers any pain; it is whether she is fully credible when she claims that her [pain]... prevents her from engaging in her prior work.").

C. The ALJ's RFC Determination
Plaintiff alleges that the ALJ failed to adequately assess plaintiffs RFC in light of Singh, 222 F.3d 448 and Lauer v. Apfel, 245 F.3d 700 (8th Cir.2001). Plaintiff argues that the ALJ incorrectly determined *1005 her RFC by failing to account for her mental health limitations, discrediting Dr. Clohisy's opinion she could not work, and failing to clarify inconsistencies by fully and fairly developing the record. Moreover, plaintiff states that the ALJ's RFC assessment is inconsistent with a functional assessment by Dr. Hammond, which was made part of the record subsequent to the hearing.
The RFC "is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." S.S.R. 96-8p, 1996 WL 374184, at *3 (Soc. Sec. Admin. July 2, 1996). The determination of residual functional capacity is a medical issue, Singh, 222 F.3d at 451, which requires the consideration of supporting evidence from a medical professional. Lauer, 245 F.3d at 704. "In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional." Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir.2003).
Initially, the undersigned concludes that the ALJ insured the record was fully and fairly developed. See 20 C.F.R. §§ 404.1517 (we may ask you to have one or more physical or mental examinations or tests at our expense),; Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir.2004) ("Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case."). The record is almost 300 pages long, and contains a comprehensive list of numerous medical reports from multiple providers. Moreover, at the close of the hearing, the ALJ requested additional documentation, including physical therapy records and the November 6 report of Dr. Hammond. Also, the ALJ ordered "a psychological consultative examination to address the depression and the memory and concentration issues ...."
The undersigned concludes also that the ALJ properly discredited the November 13, 2001, opinion of Dr. Clohisy that plaintiff was "unable to do anything that causes the hip to move or that puts pressure on the hip." A treating physician's opinion normally is entitled to substantial weight. Dixon v. Barnhart, 353 F.3d 602, 606 (8th Cir.2003). Regardless of how much weight the ALJ affords a treating physician's opinion, however, the ALJ must "always give good reasons" for the weight given. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p, 1996 WL 374188, at *5 (SSA July 2, 1996); accord Dolph v. Barnhart, 308 F.3d 876, 878-879 (8th Cir.2002). Failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); see Singh, 222 F.3d at 452-53 (reversing with directions to remand in part because the ALJ failed to give good reasons for rejecting a treating physician's opinion).
In the instant case, the ALJ gave adequate reasons for discrediting Dr. Clohisy's opinion. The ALJ noted Dr. Clohisy's opinion was inconsistent with his own treatment notes, finding no clear etiology for plaintiffs pain, plaintiff was intact neurovasuclarly, plaintiff had no wound swelling or redness, and plaintiffs x-rays were normal, as well as inconsistent with other provider records. Moreover, the ALJ noted that, if Dr. Clohisy's statement was taken at face value, this would prevent plaintiff from engaging in any activity, including walking or sitting, as those activities would cause the hip to move and put pressure on the hip. There simply is no indication from Dr. Clohisy's records that he limited plaintiffs activity in any way in keeping with his statement.
*1006 Plaintiff argues further that the ALJ erred in not considering limitations due to depression when assessing her RFC. Dr. Rexroat is a non-treating provider who conducted a one-time psychological evaluation, pursuant to the ALJ's referral. While he found plaintiff has major depression, and assessed slight difficulty in interacting with the public, a supervisor, co-workers and responding appropriately to changes in the work setting, with moderate difficulty responding appropriately to work pressures, he assessed plaintiff with an overall GAF of 70, indicating mild symptoms or difficulties and generally doing well. Moreover, his report indicated no functional or social limitations, or deficiencies in concentration, persistence, pace, or memory. Dr. Rexroat noted Plaintiffs cognitive status appeared to be normal, and he estimated she functioned in the low-average intelligence range. Dr. Rexroat found no functional or social limitations on examination. Beyond Dr. Rexroat's report, the ALJ noted that plaintiff was never treated for depression, nor took medication for mental health problems, prior to or after the instant consultative examination with Dr. Rexroat; this despite the fact she reported being suicidal.
An ALJ is only required to consider impairments he finds credible and supported by substantial evidence in determining plaintiffs RFC. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir.2003) ("The ALJ properly limited his RFC determination to only the impairments and limitations he found to be credible based on his evaluations of the entire record."); Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir.1995). Moreover, "[a] one-time evaluation by a non-treating psychologist is not entitled to controlling weight." Clark v. Apfel, 141 F.3d 1253, 1256 (8th Cir.1998). The fact that plaintiff did not seek out mental health evaluation on her own, and has never been treated for or taken medication for depression, support the ALJ's decision that she is not significantly limited by a mental health condition. The ALJ did not err in failing to consider the effects of plaintiffs depression on her RFC.
Plaintiff's argument that the statements given by Dr. Hammond in June 2002 ("To Whom it May Concern" letter) and November 2002 ("Medical Source Statement of Ability to do Work-Related Activities (Physical)") are inconsistent and, therefore, required the ALJ to clarify the matter, is without merit. In the June 2002 letter, Dr. Hammond said that plaintiff may have a torn meniscus cartilage, making it difficult for her to walk more than brief distances. He stated further that with "convalescence and rehabilitation she should be able to return to work." Ultimately, Dr. Hammond opined plaintiff could not return to her usual work activities. In November 2002, Dr. Hammond completed a medical statement of her ability to do work-related activities. In this statement, he opined that plaintiff could engage in employment, with certain restrictions.
Five months lapsed between the time of the June letter and the November statement. It is not unreasonable to conclude that the statements are not inconsistent, but merely reflect a difference in plaintiffs condition over that time period. In fact, the June 2002 letter itself clearly stated that, with "convalescence and rehabilitation," plaintiff should be able to return to work. Moreover, at the time the June letter was drafted, plaintiffs most recent longterm employment was as a server in a restaurant. In this respect, it is not unreasonable to conclude Dr. Hammond's reference to "usual work" meant working as a waitress; therefore, not inconsistent with the November 2002 assessment of ability to do work-related (not work-specific) activities.
*1007 Assuming, arguendo, that the reports were inconsistent and the ALJ failed to elicit additional, clarifying documentation from Dr. Hammond, the argument is now moot, as the post-decision record contains an April 2003 "Medical Opinion Re: Ability to do Work-Related Activities." As previously noted, "[i]n cases involving the submission of supplemental evidence subsequent to the ALJ's decision, the record includes that evidence submitted after the hearing and considered by the Appeals Council." Bergmann v. Apfel, 207 F.3d 1065,1068 (8th Cir.2000); Riley v. Shalala, 18 F.3d 619, 622 (8th Cir.1994) ("[The court] must speculate to some extent on how the administrative law judge would have weighed the newly submitted reports if they had been available for the original hearing.").
In making his RFC determination, the ALJ relied on the evidence he found credible and relevant in the record as a whole. The ALJ's RFC determination is essentially comprised of the same restrictions as Dr. Hammond's assessment; thus, supported by authority and evidence of record. See Lauer, 245 F.3d at 704. Specifically, the ALJ concluded that plaintiff had no limitations with respect to sitting in an 8 hour day. Dr. Hammond's April 2003 assessment, however, notes plaintiff only can sit about 6 hours in an 8 hour day, can sit 60 minutes without changing positions, can stand 20 minutes without changing positions, and must walk around every 30 minutes, for 5 minutes at a time, and have the ability to change positions at will.
Defendant argues that Dr. Hammond's April 2003 assessment is internally inconsistent, because it states plaintiff can sit for 60 minutes, but must walk around every 30 minutes or at will. Therefore, defendant states it should be discredited and would not have been given controlling weight by the ALJ. See Cruze v. Chater, 85 F.3d 1320, 1325 (8th Cir.1996) ("[W]here the treating physician's opinions are themselves inconsistent, they should be accorded less deference."). Dr. Hammond's assessment may appear, on its face, to contain inconsistencies (plaintiff can sit for 60 minutes without changing position; plaintiff must walk around every 30 minutes; plaintiff must be able to shift at will), thereby affecting the amount of deference it is accorded. However, his assessment can be viewed as entirely consistent, concluding that plaintiff can function within certain parameters, but needs the opportunity to make changes at will, and as necessary.
While the ALJ may have found the recommendation inconsistent, affording it little deference, given Dr. Hammond's status as a treating provider who is very familiar with plaintiffs medical condition and treatment, it cannot be said the ALJ would have afforded it no deference. Moreover, the ALJ would have had, if the evidence had been available, the opportunity to inquire regarding the apparent inconsistency. See 20 C.F.R. § 404.1512(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved....").
Moreover, Dr. Hammond's assessment that plaintiff is only able to sit 6 hours in an 8 hour day is buttressed by Dr. Tayob's RFC assessment. Given this new evidence comports with the assessment of another provider, albeit non-examining, the undersigned concludes the ALJ would, had the assessment been available, given it weight in making his RFC determination. Accordingly, the ALJ should be afforded the opportunity to reevaluate his RFC determination.

D. Past, Relevant Work
Plaintiff argues that the ALJ did not make explicit findings as to the demands *1008 of plaintiffs past work, and that the ALJ should view the demands of plaintiffs past work in light of Dr. Hammond's latest assessment.
An ALJ is required to make explicit findings with regard to the demands of past relevant work. Pfitzner v. Apfel, 169 F.3d 566, 568 (8th Cir.1999) (citing Groeper v. Sullivan, 932 F.2d 1234, 1238-39 (8th Cir.1991) ("An ALJ's decision that a claimant can return to his past work must be based on more than conclusory statements. The ALJ must specifically set forth the claimant's limitations, both physical and mental, and determine how those limitations affect the claimant's residual functional capacity.")); Sells v. Shalala, 48 F.3d 1044, 1046 (8th Cir.1995). An explicit description of the relevant demands of past work can be derived from a "detailed description of the work obtained from the claimant, employer, or other informed source." Haley v. Massanari, 258 F.3d 742, 749 (8th Cir.2001). In this regard, it appears as though, based on his citation to the record, the ALJ deferred to plaintiffs description of her previous work as a secretary and electronics tester.
Plaintiff states that her work as a secretary required her to sit for 7.5 hours, walk for 30 minutes, and stand for 30 minutes, in a work day. (Tr. 83.) As an electronics tester, plaintiff reported she was required to walk 1 hour, stand 1 hour, and sit for 7 hours, per day. (Tr. 86.) Neither the plaintiff nor the ALJ made any findings with respect to plaintiffs ability to shift positions at will. Moreover, it appears that Dr. Hammond's latest assessment, and Dr. Tayob's RFC determination, are in conflict with the ALJ's RFC determination with respect to plaintiffs ability to sit during a work day. In light of the foregoing, the ALJ should be afforded the opportunity to make additional findings with regard to the relevant aspects of plaintiffs past employment, and her current ability to engage in that work.

RECOMMENDATION
For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be reversed under Sentence 4 of 42 U.S.C. § 405(g) and the action be remanded to the Commissioner for further proceedings consistent with this opinion. On remand, the ALJ should evaluate plaintiffs RFC in light of Dr. Hammond's April 2003 assessment, and make findings and determinations as to plaintiffs ability to engage in past, relevant work as a secretary and an electronics tester, accordingly. Should the ALJ determine plaintiff cannot return to her past, relevant work, then he should assess plaintiffs ability to adjust to other work in the national economy, as detailed in Step Five of the evaluation sequence.
The parties are advised that they have ten (10) days in which to file written objections to this Report and Recommendation. The failure to file timely, written objections may waive the right to appeal issues of fact.
NOTES
[1] Hydrocodone is "used to relieve moderate to moderately severe pain." Medline Plus, National Institute of Health, at http://www.nlm. nih.gov/medlineplus/drugin-fo/medmaster/a601006.html (last visited December 17, 2004).
[2] Vicodin is categorized under the heading of Hydrocodone in the Physician's Desk Reference. Physician's Desk Reference (P.D.R.), 114 (55th ed.2001). "Vicodin tablets are indicated for the relief of moderate to moderately severe pain." Id., at 1630.
[3] "Prednisone, a corticosteroid, is similar to a natural hormone produced by your adrenal glands. It often is used to replace this chemical when your body does not make enough of it. It relieves inflammation (swelling, heat, redness, and pain) ...." Medline Plus, at http://www.nlm.ni h.gov/medlineplus/druginfo/medmaster/a601102.html (last visited December 7, 2004).
[4] "Ultram is indicated for the management of moderate to moderately severe pain." P.D.R., at 2399.
[5] "Indomethacin has been found effective in active stages of .... Moderate to severe osteoarthritis." P.D.R., at 1946.
[6] A GAF of 70 typically indicates "mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 4th Ed. (DSM-IV), 32 (1994).
[7] In her brief in support of the complaint, plaintiff states that she "has been seen in Pain Management." (Doc. 10 at 14.) However, plaintiff cites to no evidence of this in the record, she does not provide any such evidence, and a review of the record found no support for her contention. Moreover, in her April 2003 letter, she states that "[f]or [Dr. Clohisy] to even suggest a pain clinic was absurd. I had been living with this pain 24 hours a day 7 days a week for close to 2 years." (Tr. 262.)