365 F.Supp.2d 1018 (2005)
Shanta McJAMES, Plaintiff,
v.
Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.
No. 4:04 CV 87 DDN.
United States District Court, E.D. Missouri, Eastern Division.
March 8, 2005.
*1019 *1020 Michael C. Blanton, Belleville, IL, for Plaintiff.
Raymond W. Gruender, III, Jane Rund, St. Louis, MO, for Defendant.

MEMORANDUM
NOCE, United States Magistrate Judge.
This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Shanta McJames for supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq., and for childhood disability benefits under 42 U.S.C. §§ 202(d), 223. The parties consented to the exercise of plenary jurisdiction by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

I. BACKGROUND
A. Plaintiff's Application for Benefits and Medical Records
In September 2001, plaintiff, who was born December 19, 1976, filed an application for benefits alleging a disability onset date of September 7, 1997 due to a stroke at age 20. Plaintiff previously filed an application for benefits on January 29, 1997, and was denied by SSA on April 28, 1997. Plaintiff again filed for SSI benefits on September 14, 1998, and was denied on November 25, 1998. (Tr. 19, 70, 78, 83, 332-35.)[1]
Plaintiff reported her work history to include work as a cashier for a fast-food restaurant from February 2000 to April 2000. From September 1996 to October 1996, plaintiff worked in another fast-food restaurant as a cook. From February 1995 to June 1995, plaintiff worked in the men's department of a retail store. Plaintiff's earning history is as follows:

1995 1747.67 1998 .00
1996 .00 1999 .00
1997 .00 2000 556.05

(Tr. 73, 107-10.)
Plaintiff's relevant medical records begin with visits to the Lawndale Christian Health Center from December 7, 1998, to *1021 September 22, 1999. During this time, plaintiff reported multiple instances of nausea, which providers assessed as secondary to gastrointestinal reflux disease. Providers also noted plaintiff had a stroke in 1997 and had diabetes. Providers noted on several occasions that plaintiff did not take her insulin as directed, and that her blood glucose level was significantly elevated. Plaintiff proffered various reasons for not taking her insulin, including that she was having difficulty obtaining test strips through her medical insurance coverage and did not want to take insulin without knowing her blood sugar, and that she had not been eating regularly due to a lack of appetite. An MRI and MRA during this time period were "unremarkable." An April 26, 1999, record entry states that a provider contacted plaintiff and told her she had no medical basis for disability. (Tr. 190-95, 199-203, 247-48.)
On April 19, 1999, plaintiff underwent an electromyography (EMG)[2] examination due to paresthesia[3] in her hands. The examination was normal, with "no electrophysiological evidence for neuropathy, or cervical radiculopathy." (Tr. 250-51.)
On May 17, 1999, Dave Arnold, M.D., completed a "Documentation of Medical Condition" pertaining to plaintiff's attempt to receive Temporary Assistance for Needy Families (TANF) from the Illinois Department of Human Services. Dr. Arnold listed plaintiff's medical history to include diabetes, migraines, and gastric reflux. He concluded plaintiff was not prevented from working due to a medical condition. (Tr. 196-98.)
On January 8, 2001, plaintiff was seen at the St. Louis County Department of Health due to pregnancy. At that time, R. Hushew, LCSW, noted plaintiff reported being treated for depression, and that she would soon begin a GED and job training program. On January 19, 2001, plaintiff provided a health summary at the Pinelawn Center of Saint Louis County Health. The assessment noted plaintiff became an insulin dependent diabetic in 1997, but was not taking any medications at the date of evaluation. It was further noted that plaintiff had controlled asthma, and had a long history of hypertension, but was not currently taking any medications for the condition. The assessment also revealed plaintiff had previously suffered a mild heart attack, had a stroke in 1997, and was taking Paxil.[4] (Tr. 258, 261-64.)
In a September 25, 2001, "Disability Report Adult" form, plaintiff reported her disabling conditions to be "paranoia, schizophrenia, asthma, [hypertension], stroke, [and] memory lapses." Plaintiff stated these conditions limit her ability to work by making her not like to be around others and afraid to go outside. Plaintiff reported failing to go outside for the two previous months. Plaintiff reported her medications at this time to include Paxil, Zestril,[5] and baby aspirin. (Tr. 92-101.)
On September 26, 2001, plaintiff was seen by Rolf Krojanker, M.D., at the *1022 Hopewell Center. Dr. Krojanker noted plaintiff had difficulty sleeping and was taking Paxil. Dr. Krojanker diagnosed plaintiff with Schizophrenia  Paranoid, insulin dependent diabetes, history of stroke, hypertension and asthma, and he prescribed Risperdal[6] and Trazodone.[7] The remaining portion of the treatment note is completely illegible. (Tr. 310-12.)
On October 12, 2001, plaintiff was seen at the Pinelawn Center to discuss medications and her reported paranoid schizophrenia. At this visit, plaintiff was referred to a social worker for psychiatric follow-up. Social service records indicate plaintiff was to see the social worker on October 19, 2001, when she was also scheduled to meet with a dietician. There is no record plaintiff saw social services at Pinelawn after October 12. (Tr. 269-70, 274.)
On October 12, 2001, plaintiff's godmother Karen D. Hubbard completed an interested "third party" questionnaire. Ms. Hubbard reported that plaintiff no longer likes to be outside, because she is afraid of being around a lot of people at one time. Moreover, Ms. Hubbard stated plaintiff had become violent towards others and believes that people are "out to get her." Plaintiff also bites the skin off her fingers, and is very shaky and distant at times. Ms. Hubbard observed plaintiff has the habit of pulling out her own hair and engaging in self-harm. (Tr. 102.)
In an October 13, 2001, "Claimant Questionnaire," plaintiff reported feeling tired, "lazy," confused, and sick to her stomach from blood pressure medication. Plaintiff stated that her symptoms are worse when she gets upset, she feels like doing harm to others, and she feels someone is trying to harm her. Plaintiff reported constantly experiencing these symptoms since she had a stroke in 1997. To relieve symptoms, plaintiff colors, and stated that she "might bite [her] fingers to ease the pain." Plaintiff takes Paxil, aspirin, and Zestril for pharmaceutical management, and reports Paxil and aspirin give her "cotton mouth" and Zestril makes her feel light-headed. Plaintiff indicates she takes all medication as prescribed. (Tr. 103.)
With respect to activities of daily living, plaintiff reports her impairment prevents her from being able to go outside without thinking someone will harm her. Plaintiff states she has difficulty falling and staying asleep. She reports good personal grooming, stating she is always clean. Regarding meal preparation, plaintiff reported typically preparing "quick and easy" meals for herself and her four children, but she used to cook a full meal every day until recurrent dizzy spells. On Sundays, plaintiff cooks dinner for herself and the children to enjoy together. (Tr. 104.)
Plaintiff stated she has difficulty following directions, because she cannot understand what people request of her. She reported grocery shopping, and states she can only engage in this activity because her "godmother came to get me so I do not be afraid." While grocery shopping, plaintiff needs assistance obtaining the right amount of groceries for a month, and "a nice amount" of pampers for her infant. Plaintiff reported she cleans her home, she does not like to iron, and does not do laundry often because the washing machines in her building are broken. Plaintiff requires assistance from her son to carry the laundry to the basement due to *1023 residual impairments on her left side after the stroke. (Tr. 104-05.)
Plaintiff stated that she used to enjoy coloring, working crossword puzzles, and singing; however, she finds herself becoming upset and "throw[ing] everything" when currently engaging in these activities. Plaintiff further reported she no longer listens to the radio and falls asleep while watching television, but watches soap operas. Plaintiff enjoys reading, but does not read much due to poor eyesight. She has a driver's license, but does not drive because she fears people are watching her. Plaintiff leaves her home approximately twice a month, increased to about five times a month when she has physician appointments. When leaving her home, plaintiff feels paranoid and scared, and tries to get home as quickly as possible. Plaintiff reported no difficulty paying her bills. (Tr. 105.)
Plaintiff said she does not socialize with her neighbors because she "sometimes [has] the feeling to snap [their] necks. So I just stay away." Plaintiff only speaks with certain family members, and does not converse on the phone except for "important call[s]." Plaintiff is the primary care giver for all four of her children, and is responsible for ensuring they are clean, are fed, are clothed, go to school, and are taken care of in any other respect. Plaintiff reported that taking care of her children is her only activity. (Tr. 106.)
On October 15, 2001, plaintiff saw Thomas Irwin, M.S.W., L.C.S.W., for assessment at the Hopewell Center. At this visit, plaintiff was alert, cooperative, groomed, and appropriate. Mr. Irwin noted plaintiff reported feeling paranoid and scared, decreased sleep and appetite, social isolation, and auditory and visual hallucinations. Plaintiff maintained good eye contact during the interview, possessed relevant and coherent thought, denied suicidal or homicidal ideation, exhibited a depressed mood with blunt affect, exhibited no delusions, and exhibited good memory, insight and judgment. An assessment dated October 15, 2001, diagnosed plaintiff with schizoaffective disorder, personality disorder not otherwise specified, hypertension  essential, an Axis IV diagnosis of 82,[8] and assigned a GAF of 42, with her highest GAF being 45.[9] While there is no provider signature on this assessment, Mr. Irwin is indicated on the assessment as plaintiff's therapist, it was completed on the same day plaintiff met with Mr. Irwin, and it is consistent with his handwriting on treatment records. (Tr. 313-22, 325.)
In an October 17, 2001, "Disability Report Adult" form, plaintiff reported her disabling condition preventing employment as a stroke in 1997, and that she stopped working because she relocated and had no available transportation. Regarding treatment for her stroke, plaintiff said she received therapy, walked with a cane for a period of time, and has a "twist" on the left side of her mouth. Plaintiff reported her prescription medications to include aspirin, Paxil, and Zestril. (Tr. 82-91.)
On November 13, 2001, plaintiff was evaluated by L. Lynn Mades, Ph.D., at SSA's request. Prior to examination, Dr. *1024 Mades did not review any of plaintiff's medical records, and formed her opinion solely based on this examination. Plaintiff alleged she suffered from paranoid schizophrenia, asthma, high blood pressure (borderline), diabetes that is controlled without medication, a stroke, and memory lapses. Plaintiff further reported experiencing "tremors," feeling nervous, feeling afraid to leave her home, and "hearing voices that tell her to hurt herself." Plaintiff informed Dr. Mades that she began to experience symptoms in April 2001, which were not eased by taking Paxil. Plaintiff stated she was diagnosed at that time with paranoid schizophrenia, but began having psychiatric symptoms in 1997 that were treated by her primary care physician. (Tr. 275.)
Plaintiff described hearing two to three voices initially sounding like they were inside her head, but then sounding more like someone is in the room with her. The voices are not continuous, and will "go away" when she is around others or distracted. Plaintiff noted she began psychiatric treatment in September 2001, and began taking psychiatric medications on October 26, 2001  Trazadone and Risperdal. Plaintiff asserted her mother was diagnosed with paranoid schizophrenia, necessitating plaintiff be removed from her care as a child. Plaintiff further reported difficulty sleeping, but not feeling tired when failing to get an adequate amount of sleep. Plaintiff acknowledged not eating for days at a time, but at times intentionally skipping meals. (Tr. 275-76.)
Plaintiff presented as well-groomed and hygienic, as cooperative and pleasant, as alert, with normal gait, and free of a deficit in motor functioning. Dr. Mades noted plaintiff was spontaneous, coherent, relevant, and logical, with normal non-tangential speech and adequate expressive language ability. Plaintiff's mood was euthymic,[10] with a slightly blunt affect. Plaintiff exhibited no thought disturbances, and failed to report delusions, visual hallucinations, or suicidal or homicidal ideation. Dr. Mades assessed no real sensory deficits noting plaintiff had expressed fair verbal judgment, could perform simple calculations, had fair to slightly limited insight and judgment, and intact memory. (Tr. 277-78.)
With respect to activities of daily living, plaintiff reported taking care of her children and primary responsibility for all household chores. She reported taking the bus rarely, relying principally on "medical transport" for transportation. Dr. Mades noted plaintiff's ability to relate was fair on examination, and that plaintiff reported feeling "somewhat nervous and uncomfortable around others." Moreover, Dr. Mades assessed plaintiff retained the capacity to care for her personal needs and engage in some cooking and cleaning, and showed adequate attention, concentration and persistence, with a slightly decreased pace. (Tr. 278-79.)
Dr. Mades diagnosed plaintiff with psychotic disorder not otherwise specified, borderline hypertension, history of diabetes and history of stroke, and mild psychosocial and environmental problems, with interpersonal difficulties. She assigned a Global Assessment of Functioning (GAF) of 70.[11] Narratively, Dr. Mades assessed that plaintiff's report of auditory hallucinations *1025 was somewhat credible, and that plaintiff may have had a history of depression, but failed to note such or appear depressed during the examination. Due to possible depression, Dr. Mades was unable to assess plaintiff's exact psychiatric difficulty, and determined she may not be experiencing "a purely psychotic process." Dr. Mades found no evidence of thought disturbance or mood disturbance (beyond plaintiff's somewhat blunt affect). (Tr. 279.)
Dr. Mades ultimately determined plaintiff had mild psychological impairment that would limit her from engaging in sustained employment. Plaintiff is able to perform simple, manual tasks with limited interaction with others during a normal workday; however, she may experience occasional interruptions, on a sustained basis, due to a mental disorder. Dr. Mades opined plaintiff's prognosis was guarded, but would improve to fair with continued psychiatric treatment. (Tr. 280.)
On November 13, 2001, plaintiff underwent a general medical evaluation by Eleanor Abada, M.D. Dr. Abada noted plaintiff alleged a life-long history of asthma, triggered by dust, excessive heat, household cleaning liquids, and other factors. Plaintiff is prescribed an Albuterol[12] inhaler for treatment. Dr. Abada noted plaintiff has a history of hypertension, which was controlled at the time of examination without medication. Dr. Abada acknowledged plaintiff reported having a stroke in 1997 and that her symptoms related to the stroke are resolved at examination, but plaintiff reports residual left, upper extremity weakness. During examination, plaintiff reported having three recent episodes of emotional outbursts toward family members, but that she does not remember the incidents. Examination revealed plaintiff was well-groomed, clean, an appropriate conversant, had no difficulty with movement, and had normal speech and hearing. Neurological and musculoskeletal examinations were essentially normal. (Tr. 281-84.)
The record contains a case note from Dennis McGraw, D.O., dated November 29, 2001. Dr. McGraw noted that plaintiff has a history of migraines, a stroke, asthma, and hypertension. He further noted plaintiff has had no hospitalizations for asthma, and that her blood pressure is normal without treatment. Dr. McGraw identified that plaintiff reported "per the form" that her activities of daily living are limited by psychiatric issues, but the examining consultative psychologist noted plaintiff managed all household chores and was the primary care giver for her four children. Ultimately, Dr. McGraw concluded that medical records do "not support any current physical limitations. [Psych.] is the main issue. This appears physically non severe." (Tr. 307.)
On December 19, 2001, non-examining, non-treating examiner M. Lee Borrine, Ph.D. completed a "Psychiatric Review Technique" form. He evaluated plaintiff based on Listing 12.03 for schizophrenia, paranoia, and other psychotic disorders. Dr. Borrine found plaintiff has moderate restrictions of daily living, marked difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and has had one to two episodes of decompensation. (Tr. 288-302.)
Dr. Borrine also completed a "Mental Residual Functional Capacity Assessment." He noted plaintiff was not significantly limited or there was no evidence of limitation in her ability to remember locations *1026 and work-like procedures, understand and remember very short and simple instructions, carry out detailed instructions, sustain an ordinary routine without special supervision, make simple work-related decisions, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and set realistic goals or make plans independently of others. Dr. Borrine found plaintiff was moderately limited in her ability to understand and carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest, interact appropriately with the general public, maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, and travel in unfamiliar places or use public transportation. (Tr. 303-04.)
Dr. Borrine determined plaintiff was markedly limited in her ability to work in coordination with or proximity to others without being distracted by them, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Narratively, Dr. Borrine opined plaintiff could "perform simple repetitive tasks in [a work] [environment] [with] limited interaction." He further noted that medical records substantiated plaintiff's allegations of paranoia and "are deemed fully credible." (Tr. 302-04.)
On December 21, 2001, Dr. Krojanker prescribed Seroquel.[13] The remaining portion of the treatment note is illegible. Also on this date, plaintiff failed to attend her appointment with Mr. Irwin. (Tr. 326.)
On January 11, 2002, plaintiff saw Mr. Irwin. He noted plaintiff was alert and cooperative. Plaintiff reported continuing to hear voices and experiencing paranoia despite taking medication. Plaintiff stated she isolates herself in her home, because she thinks about what it would be like to "hurt" someone and she does not want to act on these thoughts. Plaintiff also saw Dr. Krojanker on this date. It appears he noted plaintiff was oriented times two, but the remainder of his treatment note is illegible. A medication profile (dated 26, 01 of an unknown month) completed by Dr. Krojanker shows plaintiff is taking an Albuterol inhaler, insulin, a birth control pill, Zoloft, and Zyprexa.[14] Dr. Krojanker assessed plaintiff's GAF at 30,[15] with the highest GAF unknown. (Tr. 328-29.)
On May 3, 2002, Dr. Krojanker drafted a letter to the Missouri Department of Social Services stating plaintiff was currently under his care for schizophrenia, paranoid type, prescribed Zyprexa and Zoloft for treatment, and "not stable enough at this time to maintain employment." (Tr. 323.)
On May 8, 2002, plaintiff completed an SSA form requesting a disability hearing. At that time, plaintiff reported she continued to not be able to go outside alone, for "fear that everybody is out to get me. All *1027 I do is stay in the house with my kids." Plaintiff reported her prescription medications to include Zoloft and Zyprexa. (Tr. 121-22.)
On May 24, 2002, plaintiff saw Mr. Irwin. Plaintiff presented as alert, cooperative, and appropriately groomed. Plaintiff reported concern over a fifty pound weight gain, feeling extremely irritable, feeling as if people are always looking at her, not liking to be around others, and visual hallucinations. Mr. Irwin assessed plaintiff had a depressed mood and restricted affect. Plaintiff also saw Dr. Krojanker on May 24, 2002. The only legible portion of this treatment note is what appears to be a prescription for Benadryl.[16] (Tr. 327.)
On January 17, 2003, plaintiff completed a "Claimant's Recent Medical Treatment" form. At this time, plaintiff reported Dr. Krojanker informed her that she needs to take prescription medication to control her impairments or they will worsen over time, and that her condition is life-long. Plaintiff stated her medications included Seroquel, Avandia,[17] Glucophage,[18] Lantus,[19] aspirin, Dipehnhydramine,[20] Advair,[21] ibuprofen, and nasal spray. (Tr. 123-24.)
On January 24, 2003, plaintiff failed to attend a scheduled appointment at Hopewell Center. (Tr. 326.)
B. Plaintiff's Hearing Testimony
The ALJ conducted a hearing on February 25, 2003, at which plaintiff was represented by counsel. Plaintiff testified she is a single mother with four children aged one to nine years. Plaintiff completed school through the eleventh grade, and does not hold a General Educational Development (GED) certificate. Her current source of income is from Temporary Assistance to Needy Families (TANF). (Tr. 34-35.)
Plaintiff testified she first began working in retail in 1996, and was fired after being off work for several weeks due to illness. Plaintiff next worked in a fast-food chain for one month. Plaintiff testified she was fired from that position, because she "couldn't deal" with her boss giving her instructions on how to work as a cook, and "couldn't deal with the customers" as a cashier. Plaintiff testified she again worked at a fast food restaurant for approximately two months in early 2000. Plaintiff testified she was fired from this position "because I couldn't deal with the customers and the workers and the constant getting told what to do and I really  I couldn't take the instructions of being told what to do." Plaintiff most recently obtained work in Fall 2002 through a placement program, but she testified that she was unsuccessful in this position due to feeling "nervous" on the bus, and feeling *1028 anxious and "cluttered and closed in" around her work space, despite the employer's accommodations. (Tr. 35-38.)
With respect to her mental impairments, plaintiff testified that her mother physically abused her as a child. Around fourteen or fifteen years of age, plaintiff stopped being social "and trying to have a normal teenager life. I couldn't do it." In 2001, plaintiff testified she went to the Pinelawn Health Center for a check-up. On this visit, a social worker suggested plaintiff receive services from a home health nurse, and that nurse referred plaintiff to the Hopewell Clinic. At Hopewell, plaintiff began treatment under the care of Dr. Krojanker. (Tr. 37-40.)
Plaintiff began seeing both Dr. Krojacker and Thomas Irvin monthly. Since early 2003, plaintiff has being seeing a new psychiatrist, but she could not pronounce his name. Plaintiff testified she would talk with Mr. Irvin, and he would consult with Dr. Krojanker about her medication treatment. Plaintiff testified she was first treated with Risperdal, and was also prescribed Zoloft and Prozac.[22] Plaintiff testified she was taking Seroquel and Benadryl at the time of the hearing. Plaintiff testified her current medications cause sleepwalking, and possibly physical tremors, but the etiology of this condition is currently unknown. Plaintiff testified that she felt initially that her treatment was not effective, stating that she would explain things that would happen between visits, and then her provider would simply right a prescription for a higher dose of the same medication. (Tr. 40-42, 49-51.)
Plaintiff testified that she hears voices directing her to "do things" almost daily, and this condition is exacerbated if she is not keeping busy. Plaintiff further testified that on analmost daily basis she sees or hears people who are not really there. Plaintiff further testified that family members have noted she occasionally presents herself as someone else, but plaintiff does not remember doing this. Plaintiff testified voices tell her to commit suicide, but she does not attempt because of her children. Plaintiff testified she has homicidal ideation when people make her "pretty upset," and, therefore, she spends most of her time at home. Plaintiff testified she leaves her home approximately three times per month to grocery shop or for physician appointments. (Tr. 42-44.)
Plaintiff testified that she does not like to be physically touched for fear she will be harmed. When she leaves home, plaintiff testified she experiences panic attacks and feels as if people are staring at her, discussing her, or will harm her in some fashion. Plaintiff experiences these symptoms when she is in the company of five or more people. (Tr. 44-45.)
With respect to her activities of daily living, plaintiff testified she prepares meals for her children, cleans her home, bathes her children, and is responsible for getting her two school-age children to school. Plaintiff spends much of the day watching television. She testified she has no friends, and her family does not visit often. Plaintiff testified that it is "mandatory" for her to keep herself clean and well-groomed due to her diabetes. (Tr. 46, 48.)
Regarding employment, plaintiff testified she would have difficulties in a work-setting, because she does not take instruction well, cannot be in the company of a number of people, and feels nervous about taking the bus due to the fact she has been both robbed and hit by a car waiting for the bus. Plaintiff testified she did not know if she would be successful in a work-setting *1029 where she had limited interaction with people. (Tr. 46-47.)
C. The ALJ's Decision
In a March 9, 2003, decision denying benefits, the ALJ determined that plaintiff did not have an impairment, or a combination of impairments that met or equaled a Listing. The ALJ noted plaintiff originally filed an application for SSI benefits on January 29, 1997, which was denied by the SSA on April 28, 1997. Plaintiff again filed for SSI benefits on September 14, 1998, and was denied on November 25, 1998. (Tr. 19.)
The ALJ determined that, because no fraud or similar fault was involved in the decision to deny benefits requested by plaintiff in her 1998 application, he would not reopen the 1998 application as plaintiff implicitly requests by identifying the date of disability in her September 2001 application as September 1997. The ALJ noted that plaintiff is eligible for payments at the later of the first day of the first month following the month of application or the date of disability. Given the denial of past applications, the ALJ determined plaintiff was eligible for SSI beginning October 2001, and for the purposes of her childhood disability benefits, he would review the evidence from November 26, 1998, to the date she turned twenty-two and was no longer eligible for childhood disability benefits, December 19, 1998. Accepting plaintiff's application as true, the ALJ determined she met the non-disability requirements for adult child's benefits on the employment record of John Robinson. (Tr. 20.)
The ALJ noted plaintiff reported on disability documents that she suffers from the effects of a stroke, high blood pressure, depression, diabetes, insomnia, asthma, and paranoid schizophrenia, which cause her to hear voices, talk to herself, see people who are not there, not like being touched, not like being around others, experience panic attacks, experience paranoia, have suicidal and homicidal ideations, and not take instructions well. (Tr. 21.)
The ALJ described the relevant medical evidence subsequent to November 26, 1998. He noted the record failed to reveal plaintiff needed significant treatment for hypertension, diabetes, a stroke, depression, and allergies. Providers determined plaintiff's asthma was "well-controlled" and she did not take medication for hypertension. (Tr. 21-22.)
The ALJ referred to the assessment of consulting examiner Dr. Mades finding plaintiff had a GAF of 70, was able to engage in household chores, related well during the examination, maintained adequate attention, concentration and persistence, with a slightly decreased pace, was well-groomed, was cooperative and pleasant, was spontaneous, coherent, relevant and logical, denied experiencing visual hallucinations, and reported credible auditory hallucinations, but showed no evidence of experiencing auditory hallucinations during the examination. (Tr. 22.)
The ALJ detailed medical records from Hopewell Center and plaintiff's treating physician Dr. Krojanker. He noted that in May 2002 Dr. Krojanker opined plaintiff was not stable enough to maintain employment. The ALJ accorded Dr. Krojanker's opinion no deference,
because it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with the other substantial evidence in the case record. No examination revealed signs that the claimant had significant limitations in her daily activities, socializing, concentration, persistence, and pace. Examiners observed that she was alert, oriented, cooperative, and adequately groomed. No examiner observed that the claimant appeared to be *1030 as ill at ease as the claimant's allegations about being paranoid suggest she should be. No examiner observed that the claimant behaved as though she were reacting to auditory hallucinations. Dr. Mades essentially stated the claimant did not have a severe mental impairment. There is no objective medical evidence in the record she required psychiatric hospitalization.
(Tr. 23) (internal citations omitted).
With respect to plaintiff's credibility, the ALJ concluded she is not credible about the severity of her impairments. He noted plaintiff reported the ability to clean, cook, shop, read, manage money, and to take walks. Moreover, plaintiff reported inconsistently with respect to having visual hallucinations, reported on an SSA form that she stopped working because she relocated and had no transportation not because of her impairments, and has only a two year work history making no more than $1800 in any year. (Tr. 23.)
The ALJ found plaintiff did not have a severe mental impairment satisfying the criteria in Part A of a listing, and she had no limitations of activities of daily living, slight limitations of social functioning, concentration, persistence or pace, and no episodes of decompensation under Part B criteria. He ultimately concluded plaintiff's impairments are non-severe, and that she was not disabled for the purposes of SSI benefits during any relevant period.
The Appeals Council declined further review. Hence, the ALJ's decision became the final decision of the defendant Commissioner subject to judicial review. (Tr. 6-8.)
In her appeal to this court, plaintiff argues that the ALJ erred in (1) concluding her paranoid schizophrenia was not a severe impairment; (2) determining that she was not credible; and (3)according improper weight to the consulting examiner.

II. DISCUSSION
A. General Legal Framework
The court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir.2002). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id.; accord Jones v. Barnhart, 335 F.3d 697, 698 (8th Cir.2003). In determining whether the evidence is substantial, the court must consider evidence that detracts from, as well as supports, the Commissioner's decision. See Brosnahan v. Barnhart, 336 F.3d 671, 675 (8th Cir.2003). So long as substantial evidence supports the final decision, the court may not reverse merely because opposing substantial evidence exists in the record or because the court would have decided the case differently. See Krogmeier, 294 F.3d at 1022.
To be entitled to benefits on account of disability, a claimant must prove that she is unable to perform any substantial gainful activity due to any medically determinable physical or mental impairment, which would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A) (2004). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. §§ 404.1520, 416.920 (2003); see also Bowen v. Yuckert, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (describing the framework); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir.2003). If the Commissioner can find that a claimant is or is not disabled at any step, a determination or decision is made and the next step is not reached. 20 C.F.R. § 404.1520(a)(4).
*1031 B. Severity of Plaintiff's Mental Health Impairment
SSA regulations provide "[a]n impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 CFR § 404.1521(a). Axiomatically, an impairment is severe if it significantly limits basic work components, including physical functions, sensory functions, understanding and remembering simple instructions, judgment, responding appropriately to co-workers, supervisors and work settings, and responding to changes in a work setting. See 20 CFR § 404.1521(b). Plaintiff asserts the ALJ erred in concluding her impairment of paranoid schizophrenia is not a severe impairment. The court agrees, finding the substantial evidence of record unequivocally indicates that plaintiff suffers from a severe impairment.[23]
The ALJ discounted the opinion of treating physician Dr. Krojanker in making his decision. A treating physician's opinion normally is entitled to substantial weight. Dixon v. Barnhart, 353 F.3d 602, 606 (8th Cir.2003). Regardless of how much weight the ALJ affords a treating physician's opinion, however, the ALJ must "always give good reasons" for the weight given. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p, 1996 WL 374188, at *5 (SSA July 2, 1996). Although a treating provider is accorded substantial weight, the ALJ must still consider the record as a whole. Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir.1996).
The ALJ properly discounted Dr. Krojanker's statement that plaintiff could not engage in employment, as dispositive of the issue. Sampson v. Apfel, 165 F.3d 616, 618-19 (8th Cir.1999) (an ALJ is not required to adopt the opinion of a physician on the ultimate issue of the ability of a claimant seeking social security disability benefits to engage in gainful employment); Cruze, 85 F.3d at 1325 (quoting Nelson v. Sullivan, 946 F.2d 1314, 1316 (8th Cir.1991) ("[S]tatements that a claimant could not be gainfully employed `are not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner].'")).
While the ALJ was not required to accept Dr. Krojanker's opinion that plaintiff could not work due to schizophrenia as dispositive, it does not mean that his diagnoses and opinions as plaintiff's treating psychiatrist should not be considered or are of no value. Dr. Krojanker is plaintiff's only treating physician, he diagnosed her with paranoid schizophrenia, he prescribed medication for this condition, and he assigned plaintiff a GAF of 30. Cf. Hamilton v. Barnhart, 355 F.Supp.2d 991, 993-94 (E.D.Mo.2005) (acknowledging GAF score as a factor to consider in evaluating an examining, non-treating provider's assessment); Quaite v. Barnhart, 312 F.Supp.2d 1195, 1200 (E.D.Mo.2004); Matney v. Apfel, 48 F.Supp.2d 897, 904 (W.D.Mo.1998) (discounting provider's medical opinion, based partly on inconsistency with the provider's assessed GAF score).
In contrast to a treating physician, "[a] one-time evaluation by a non-treating psychologist is not entitled to controlling weight." Clark v. Apfel, 141 F.3d 1253, 1256 (8th Cir.1998); Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir.2004) ("[W]e do not consider the opinions of non-examining, consulting physicians standing alone *1032 to be `substantial evidence.'"); Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir.1999) (opinion of a consulting physician who does not examine the claimant does not ordinarily constitute substantial evidence).
The ALJ relied heavily on the opinion of one-time examining, consulting psychologist Dr. Mades. Plaintiff saw Dr. Mades for a one-time evaluation, and Dr. Mades relied only on this interview in making her assessment. Dr. Mades found plaintiff had a mild psychological impairment that would limit her from engaging in sustained employment, and that she was limited to simple, manual tasks with limited interaction with others during a normal workday. Dr. Mades found that plaintiff may experience occasional interruptions regarding employment, on a sustained basis, due to a mental disorder, and assigned a GAF of 70.
In his opinion, the ALJ failed to acknowledge or evaluate the opinion of non-examining, non-consulting psychologist Dr. Borrine. Unlike Dr. Mades, Dr. Borrine engaged in an extensive review of plaintiff's relevant medical records, and provided a specific assessment and narrative of her medical condition and her ability to engage in employment. Cf. Anderson v. Barnhart, 344 F.3d 809, 813 (8th Cir.2003) (noting deference afforded to a more thorough assessment of a one-time consulting physician than a treating physician); Ward v. Heckler, 786 F.2d 844, 846-47 (8th Cir.1986) (per curiam) (holding that a treating physician's conclusory opinions warranted less deference than the "detailed and thorough" reports of two consulting physicians).
Dr. Borrine opined plaintiff had moderate restrictions of daily living, marked difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and has had one to two episodes of decompensation. He found plaintiff's psychiatric impairments limited her to employment with simple, repetitive tasks, with limited interaction.
Taken together with the record as a whole, a non-examining provider's medical opinion can be considered when forming the basis of an ALJ's opinion. See Harvey, 368 F.3d at 1016 ("[T]he ALJ in this case did not rely solely on Dr. Kahn's opinion to reach his conclusions. Rather, the ALJ relied on [the non-examining provider's] opinion as one part of the record, which, as a whole ... provides substantial support for his findings."). While neither Dr. Borrine's or Dr. Mades's opinions are entitled to controlling weight, when viewed in light of each other and additional evidence of record, they are consistent with other provider observations. See SSR 96-6P, 1996 WL 374180, at *1-3 (SSA July 2, 1996) (an ALJ must treat expert opinion evidence of non-examining providers in conjunction with the other evidence of record).
Moreover, the ALJ did not discuss relevant portions of treatment notes from plaintiff's therapist, Thomas Irwin. SSA regulations allow consideration of therapists opinions in determining severity of an impairment and how it affects a claimant's ability to work. See 20 CFR § 404.1513(d)(1) ("[W]e may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to ... therapists[.]"). Mr. Irwin assigned plaintiff a GAF of 42, diagnosed her as schizophrenic, and noted she reported paranoia, visual and auditory hallucinations, social isolation, and feeling like she was going to hurt another person.
Moreover, the medical evidence supports some of plaintiff's subjective complaints. The ALJ determined plaintiff is not credible regarding the severity of her *1033 condition. Assessing a claimant's credibility is primarily the ALJ's function. See Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir.2003) (finding a claimant's credibility is primarily a matter for the ALJ to decide); Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir.2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."). In Singh v. Apfel, the Eighth Circuit held that an ALJ who rejects subjective complaints must make an express credibility determination explaining the reasons for discrediting the complaints. Singh, 222 F.3d 448, 452 (8th Cir.2000).
The ALJ supported his credibility determination based on a perceived lack of medical support, in addition to plaintiff's inconsistency in identifying visual hallucinations, limited, low-earning work record, demeanor at hearing, report on one SSA form that she ceased working due to relocation and a lack of transportation, and ability to engage in household chores and care for her children.
Dr. Mades found plaintiff's allegations of auditory hallucinations to be somewhat credible, and after reviewing her complete medical record, Dr. Borrine found plaintiff's allegations of paranoia to be fully credible. The ALJ noted that Dr. Mades did not observe plaintiff experience auditory hallucinations during examination; however, plaintiff told Dr. Mades that the voices she hears tend to cease when she is distracted or around others. Seemingly, it would be consistent with plaintiff's report that no provider would witness plaintiff experiencing an auditory hallucination. Moreover, there is no evidence in the record detracting from plaintiff's reported social isolation and paranoia, which she has consistently maintained to all providers, and is supported by the testimony of Ms. Hubbard.
Arguably, none of the aforementioned medical records, observations, or subjective reports would singularly evidence a severe impairment. Their combination, however, constitutes substantial evidence of a severe impairment significantly limiting plaintiff's ability to engage in basic work activities, and the ALJ erred in finding otherwise.
For these reasons, this case is remanded to the Commissioner in accordance with this Memorandum. On remand, the ALJ shall evaluate Shanta McJames's residual functional capacity, and determine her ability to return to past, relevant work or to engage in other work in the national economy, in accordance with the five-step sequential evaluation (20 C.F.R. §§ 404.1520, 416.920).
An appropriate order shall issue herewith.

ORDER
In accordance with the Memorandum filed herewith,
IT IS HEREBY ORDERED that the decision of the Commissioner of Social Security is reversed under Sentence 4 of 42 U.S.C. § 405(g) and the action is remanded to the Commissioner for further proceedings. On remand, the ALJ shall evaluate Shanta McJames's residual functional capacity, and determine her ability to return to past, relevant work or to engage in other work in the national economy, in accordance with the five-step sequential evaluation (20 C.F.R. §§ 404.1520, 416.920).
NOTES
[1] Because plaintiff's second application for disability benefits was denied on November 25, 1998, the court will evaluate the record only as it exists after this period, as did the ALJ. The parties do not dispute this time frame is the relevant assessment period.
[2] "[A]n EMG or electromyography test measures the response of muscles to stimulation. It's most often performed on patients with symptoms of weakness and decreased muscle strength. The test shows whether the weakness is caused by a neurological or muscle condition." University of Virginia Health Systems, at http://www. healthsystem.virginia.edu/internet/neurology-care/emg.cfm (last visited March 2, 2005).
[3] "An abnormal or impaired sensation of the body, such as numbness, tingling, or burning." About.com Glossary at http:// ms.about.com/cs/glossary/g/paresthesia.htm (last visited March 2, 2005).
[4] "Paxil ... is indicated for the treatment of depression." Physician's Desk Reference (P.D.R.) 315 (55th ed.2001).
[5] Zestril "is indicated for the treatment of hypertension." Id. at 656.
[6] Risperdal "is indicated for the management of the manifestations of psychotic disorders." Id. at 1581.
[7] Trazodone is indicated "[f]or the symptomatic relief of depressive illness." Mentalhealth.com at http:// www.mentalhealth.com/drug/p30-d03.html# Head_2 (last visited March 2, 2005).
[8] These diagnoses were provided in the form of standardized diagnostic codes. The court referred to the American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed.2000) to determine the corresponding diagnoses.
[9] The GAF scale is used by clinicians to report an individual's overall level of functioning. See Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th ed.2000). A GAF of 41-50 typically indicates "[s]erious symptoms ... or any serious impairment in social, occupational, or school functioning...." Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR), 34 (Text Revision 4th ed.2000).
[10] Mood characterized by "[j]oyfullness; mental peace and tranquility." Stedman's Medical Dictionary, 545 (25th ed.1990).
[11] GAF of 61-70 typically indicates "[s]ome mild symptoms ... or some difficulty in social, occupational, or school functioning..., but generally functioning pretty well, has some meaningful interpersonal relationships." Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR), 34 (Text Revision 4th ed.2000).
[12] Albuterol, commonly referred to as proventil, "is indicated in adults ... for the treatment or prevention of bronchospasm with reversible obstructive airway disease and for the prevention of exercise-induced bronchospasm." P.D.R. at 2930.
[13] Seroquel "is indicated for the management of the manifestations of psychotic disorders." Id. at 640.
[14] Zyprexa "is indicated for the management of the manifestations of psychotic disorders." Id. at 1789.
[15] A GAF of 21-30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment ... or inability to function in almost all areas." Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR), 34 (Text Revision 4th ed.2000).
[16] Benadryl is indicated for the relief of allergic conditions. Benadrylusa.com at http: //www. benadrylusa.com/ index.asp?sec =0 & page=0 & from=10 (last visited March 2, 2005).
[17] "Avandia is indicated as an adjunct to diet and exercise to improve glycemic control in patients with type 2 diabetes mellitus." P.D.R. at 3073.
[18] Glucophage "is indicated as an adjunct to diet to lower blood glucose in patients with type 2 diabetes...." Id. at 1006.
[19] Lantus "is indicated for once-daily subcutaneous administration at bedtime in the treatment of adults ... with type 1 diabetes mellitus or adult patients with type 2 diabetes mellitus...." Id. at 710.
[20] Dipenhydramine is the principal ingredient in Benadryl. Benadrylusa.com at http: //www.benadrylusa. com/index.asp?sec=0 & page=0 & from=10 (last visited March 2, 2005).
[21] Advair is indicated for the treatment of asthma. Advair.com at http://www.advair.com/ (last visited March 2, 2005).
[22] Prozac is indicated for the treatment of depression. Prozac.com at http://www.prozac.com/index.jsp (last visited March 2, 2005).
[23] While plaintiff does not explicitly argue in her brief that the ALJ erred in finding she did not meet Listing 12.03, the court finds the ALJ's determination in this regard was proper, as plaintiff has not made a prima facie case based on substantial evidence that she meets the A and B, or C criteria. See 20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.03.