366 F.Supp.2d 858 (2005)
Tammy BREWSTER, Plaintiff,
v.
Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.
No. 4:03 CV 1737 DDN.
United States District Court, E.D. Missouri, Eastern Division.
March 9, 2005.
*859 *860 Philip A. Senturia, St. Louis, MO, for Plaintiff.
Joseph B. Moore, St. Louis, MO, for Defendant.

MEMORANDUM
NOCE, United States Magistrate Judge.
This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security terminating plaintiff Tammy Brewster's disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq. The parties consented to the exercise of plenary jurisdiction by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

I. BACKGROUND
A. Plaintiff's Disability History and Medical Records
On September 24, 1997, plaintiff, who was born on June 19, 1966, was determined *861 to be disabled as of November 2, 1993. The Commissioner undertook a continuing disability review and, upon review, determined plaintiff was no longer disabled as of March 15, 2001, and her eligibility for benefits was terminated at that time.
Plaintiff lists her work history to include her most recent work as a customer service representative from 1992 to 1993. Prior to this position, plaintiff worked from 1990 to 1991 as a bank teller. From 1988 until 1991, plaintiff worked in a plastics factory in accounts payable and as a receptionist. From 1986 to 1990, plaintiff worked at a fast food restaurant. From 1987 to 1988, plaintiff worked as a cashier. (Tr. 130-37.)
On May 24, 1997,[1] plaintiff was admitted to Alexian Brothers Hospital for manic depression, drug and alcohol abuse, an "overdose," and her sister's recent suicide. During her hospitalization, she came under the care of H. Gunawardhana, M.D. After a four night hospital stay, plaintiff was discharged to home. Dr. Gunawardhana's diagnoses included bipolar affective illness, mixed type, type II; poly-substance abuse and dependence; and a Global Assessment of Functioning (GAF) of 50.[2] Dr. Gunawardhana reported plaintiff exhibited improvement during her admission, and she was prescribed substance abuse rehabilitation treatment, medications, and follow-up outpatient care. (Tr. 182-86.)
On October 19, 2000, plaintiff participated in a Report of Continuing Disability Interview. She reported her disabling condition as manic depression. Plaintiff stated she takes Serzone,[3] Ambien,[4] and Alprazolam[5] for this condition. Plaintiff was hospitalized twice for depression and suicidal ideation, once in 1993 and once in 1997. Plaintiff reported that her personal mobility, personal grooming, household maintenance, and recreational activities are affected on a daily basis depending on her degree of depression. (Tr. 147-54.)
In a December 2000 claimant questionnaire, plaintiff reported difficulty with concentration, memory, and crying spells, on a daily basis and with unknown etiology. To relieve her symptoms, plaintiff reported she prays, and takes Serzone, Xanax and Ambien, with no side-effects. (Tr. 176.)
Plaintiff reported her activities of daily living are affected by her depression and inability to concentrate. She reported being the primary care giver for her two children. She has difficulty falling asleep, waking often throughout the night, and getting out of bed in the morning. Plaintiff reported she no longer fixes her hair or cares about clothes as she once used to. She fixes microwave meals or canned soups, and reported failing to eat or cook at times. Plaintiff reported difficulty concentrating and irritability with following directions. She is dependent on others for transportation to go shopping. Plaintiff *862 stated she tries to keep her house clean and do the dishes. Sometimes, however, she does not feel like doing household chores. (Tr. 177-78.)
Plaintiff reported she used to enjoy reading, but can no longer engage in this activity due to an inability to concentrate. Occasionally, plaintiff tries to watch a movie or television program. Plaintiff stated she does not currently drive, and she only leaves her home when she has to and can arrange a ride. Plaintiff reported she does not like to leave her home or be around others. (Tr. 178-79.)
In December 2000, plaintiff's mother Bernice Brewster completed an interested "third party" questionnaire. She reported plaintiff was very depressed, agitated, and unfocused. She further reported witnessing no changes in plaintiff's condition over time, that plaintiff likes to "stay to her self," that plaintiff washes her hands constantly, that plaintiff is "very moody," and that plaintiff has difficulty coping. (Tr. 180.)
On March 6, 2001, non-examining, non-treating provider David W. Bailey, Psy.D., completed a Psychiatric Review Technique form. Dr. Bailey found plaintiff's affective disorders ("dep[ression] well-controlled with meds") and substance addiction disorders (history of alcohol use) were not severe impairments. Dr. Bailey assessed plaintiff had a mild degree of limitation with respect to activities of daily living, difficulties maintaining social functioning, and difficulties maintaining concentration, persistence or pace. He found plaintiff had no episodes of decompensation since the last Comparison Point Decision (C.P.D.). Dr. Bailey made these determinations based on medical records indicating plaintiff has improved with medication, she is not severely depressed, she has logical and sequential thought processes, she is appropriately dressed and well-groomed, she has not required prolonged hospitalization related to mental illness since last C.P.D., and her providers have found no marked functional limitations with respect to activities of daily living, social functioning or persistence and pace. Dr. Bailey opined that plaintiff's reported limitations and symptoms were not consistent with medical records. (Tr. 112-126.)
On May 4, 2001, plaintiff completed a "Reconsideration Report for Disability Cessation." She listed her disabling conditions as manic depression and bi-polar disorder. Plaintiff reported no change in her condition since her last disability interview or new illnesses, that she did not feel able to return to work, and that her doctor has not told her she is able to return to work. Plaintiff reported she does not feel like getting out of bed some days, she needs no assistance with grooming, her mother assists her with shopping, household chores and with her children, she watches home movies and network television, she has friends and family visit her home, and her mother provides the majority of her transportation. (Tr. 139-44.)
In a June 2001 claimant questionnaire, plaintiff reported difficulty with concentration, depression, and fatigue, caused or exacerbated by bi-polar affective disorder, major recurrent depression, and a "chemical imbalance." Plaintiff listed medications for these symptoms to include Serzone, Alprazolan, and Ambien. She reported side-effects from these medications to include fatigue and headaches. (Tr. 171)
With respect to activities of daily living, plaintiff stated that her impairments have affected her ability to socialize, and her ability to read due to a lack of concentration. She reported difficulty sleeping and waking in the morning. Plaintiff further reported she does not groom herself as she did before. Plaintiff is the primary care *863 giver for her two minor daughters. Plaintiff stated she prepares can goods and microwave dinners for meals, and she needs assistance from her mother for shopping. Regarding household chores, plaintiff is able to clean and do dishes, needing assistance from her family when she is "real depressed." Plaintiff reported no current hobbies or activities, and that she used to enjoy being around others, reading, and "go[ing] out." Plaintiff reported she watches television, but cannot "concentrate enough to watch a movie." Plaintiff also stated she does not read due to a lack of concentration. (Tr. 172-74.)
Plaintiff reported leaving her home approximately three times per week for shopping or physician's appointments, and that she does not like to leave her home. Plaintiff's driver's license is currently suspended, and she relies on her mother for transportation. With respect to plaintiff's relationship with others, she reported these relationships have changed because she feels irritable and withdrawn. She further reported difficulties using the telephone, because she cannot focus or maintain her train of thought at times. (Tr. 173-74.)
In June 2001, plaintiff's mother completed an interested "third party" questionnaire. She reported plaintiff has mood swings, is irritable, is withdrawn, is depressed, and has difficulty getting along with others because of mood swings. She further reported witnessing no change in plaintiff's condition over time, and that she "help[s] her a lot because she needs me." (Tr. 175.)
On June 22, 2001, non-examining, non-treating provider R. Rocco Cottone, Ph.D. completed a "Psychiatric Review Technique Form." Dr. Cottone found plaintiff did not have a severe impairment related to affective disorders (bipolar syndrome) or substance addiction disorders. However, he did not complete the portion of the form related to plaintiff's degree of functional limitation. (Tr. 89-102.)
On September 13, 2001, plaintiff participated in a disability hearing with Disability Hearing Officer Janet Broaden. At hearing, plaintiff testified that she has had no improvement in her condition, and in fact, has gotten worse. She reported feeling constantly depressed, being easy to cry, poor memory, difficulty focusing, not wanting to get out of bed, being uncomfortable around other people, stress induced panic attacks, feeling nauseated from medication, and problems with her back. Plaintiff reported taking Ambien, Xanax, and Effexor[6] for treatment. (Tr. 78-79, 159-66.)
Plaintiff's mother testified that her daughter cries often, cannot focus well, has gone a week without bathing, has difficulty sleeping, has severe mood swings, and has difficulty caring for her children due to depression. She further stated that while plaintiff has some good days, most days are "bad." Plaintiff's mother also testified that plaintiff wished she was dead. (Tr. 79, 167.)
In her September 26, 2001, decision denying benefits, Ms. Broaden found plaintiff had experienced medical improvement related to her ability to do work, and that plaintiff did not have a severe impairment. Accordingly, she found plaintiff was no longer disabled and entitled to a period of disability benefits. Ms. Broaden based her decision on treatment records indicating, inter alia, that plaintiff did not experience severe depression, that she was logical, coherent and stable, she had a boyfriend, she had no restrictions of activities, she had no problems maintaining social *864 functioning, and she had no problems concentrating. Ms. Broaden ultimately determined that plaintiff's subjective testimony at hearing did not comport with the medical evidence of record; thus, finding plaintiff's testimony was "less than credible." (Tr. 80-86.)
On June 25, 2002, non-treating provider Paul W. Rexroat, Ph.D., examined plaintiff at SSA's request. Dr. Rexroat noted plaintiff was transported to the examination by a friend, and she was well-dressed and groomed. During the examination, plaintiff did not appear suspicious, anxious, tense, shaky, or tremulous. She cried when talking about her depression, but exhibited a normal range of affect and emotion. She further exhibited normal energy level, gait, and posture. She was alert and cooperative, and her speech was normal, coherent, relevant, and free of flight of ideas or loose associations. (Tr. 239-40.)
Plaintiff reported that she has frequent mood swings and takes medication for anxiety, but she could not "describe significant symptoms related to anxiety." Plaintiff further reported feeling like a miserable person, that she used to be a social person but no longer likes the company of others, passive suicidal ideation with no recent attempts, feeling like someone is "out to get [her]," with no actual paranoia, hallucinations or delusions, and varied sleep patterns. Dr. Rexroat assessed plaintiff had moderate depression. (Tr. 240-41.)
With respect to cognitive functioning, Dr. Rexroat opined plaintiff exhibited good memory, was well-oriented to person, place, time and situation, and she exhibited good recall skills. Dr. Rexroat estimated plaintiff functioned in the low-average intelligence range. (Tr. 241.)
Dr. Rexroat administered the Minnesota Multiphasic Personality Inventory-II (MMPI). He noted plaintiff's results indicated she answered randomly on many of the questions, and the profile was "invalid since it has not been completed properly." Dr. Rexroat opined that plaintiff may not have completed the MMPI correctly due to a lack of cooperation, confusion, or lack of comprehension due to limited language skills. Accordingly, Dr. Rexroat noted "[l]ittle to no weight should be granted" to his interpretation of plaintiff's MMPI results. Accordingly, the ALJ did not refer to the MMPI in his decision, and the court will not provide a summary of the analysis in its opinion. (Tr. 241-43.)
Dr. Rexroat noted that plaintiff described significant symptoms of depression. He assessed she is able to understand and remember simple instructions, and exhibit sustained concentration and persistence with simple tasks. He determined plaintiff's ability to interact socially and adapt is limited, and that she has marked limitation in social functioning. However, she showed adequate social skills during the examination Dr. Rexroat further noted that plaintiff has mild limitations with activities of daily living, no significant limitations with concentration, persistence, pace and memory, and she has the ability to manage her own funds. (Tr. 244.)
Ultimately, Dr. Rexroat diagnosed plaintiff with major depression  recurrent, alcohol dependence in full remission since 1997, and psychoactive substance abuse in remission since 1997. He assessed her GAF was at 70,[7] motivation was good, and prognosis was fair. (Tr. 244-45.)
*865 On July 7, 2002, Dr. Rexroat completed a "Medical Assessment of Ability to Do Work-Related Activities (Mental)." He found plaintiff had a fair ability to follow work rules, relate to co-workers, deal with the public, deal with work stress, function independently, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. He determined plaintiff had a good ability to use judgement, interact with supervisors, maintain attention and concentration, understand, remember and carry out complete job instructions, and maintain personal appearance. He found plaintiff was without limitation with respect to her ability to understand, remember and carry out simple job instructions. (Tr. 247-48.)
Plaintiff's treating provider records consist primarily of her psychiatric treatment with Bun Tee Co, M.D. Medical records show plaintiff began treatment with Dr. Co as early as 1994, and fairly consistently until 1997. Treatment records do not indicate plaintiff received treatment from Dr. Co, or any other provider, for 1998 and 1999. (Tr. 214-36.)
Records from 2000 indicate plaintiff was prescribed Wellbutrin,[8] Xanax, Ambien, Paxil,[9] and Sonata,[10] at various times. Dr. Co consistently documented plaintiff's mood was fair, she was not severely depressed, she was neatly dressed and groomed, and her speech was logical, sequential, relevant and coherent. With respect to medication, Dr. Co noted plaintiff did not experience any side-effects, with the exception that plaintiff reported on September 20 that Paxil made her drowsy. (Tr. 215-18.)
Records from 2001 indicate that Dr. Co found plaintiff continued to have a fair mood, not be severely depressed, be appropriately dressed and groomed, and exhibit logical, sequential, relevant and coherent thoughts. During this time period, plaintiff was taking Celexa,[11] Seyma,[12] Xanax, Ambien, and Claritin-D,[13] at various times. Plaintiff failed to attend or cancel her appointment on May 19, 2001. On August 25, 2001, Dr. Co noted plaintiff was "still very anxious." On September 22, 2001, plaintiff noted Effexor made her nauseated, and Dr. Co discontinued the medication and prescribed Celexa. On October 20, Dr. Co noted plaintiff's mood continued to be dysphoric. On October 29, 2001, plaintiff informed Dr. Co she was leaving town to visit her sister for three weeks. On November 21, Dr. Co noted plaintiff reported feeling "a lot better" after taking Celexa. (Tr. 214-15, 233, 236.)
On February 2, Dr. Co completed a questionnaire related to plaintiff's disability claim. With respect to how plaintiff's mental impairment impacts her ability to perform basic tasks of daily living, Dr. Co responded "unable to observe." He stated that plaintiff is treated with medication and individual, supportive therapy, with good response. He described plaintiff's mood as low and dysphoric, with flat affect. *866 He noted she is appropriately dressed and well-groomed, has "intact" memory and intellect, has fair insight and judgment, has been compliant with medications, and is not "actively delusional or hallucinating." He found plaintiff had no restrictions with respect to activities of daily living, difficulties maintaining social functioning, and deficiencies of concentration, persistence or pace. Dr. Co was unable to observe any episodes of deterioration in a work-like setting, and he assessed plaintiff could manage her own funds. (Tr. 212-13.)
In treatment records from January 1 and March 20, 2002, Dr. Co noted plaintiff continued to be appropriately dressed and groomed, exhibit relevant, coherent, logical and sequential thoughts, experience a fair mood with no severe depression, and take Celexa, Xanax, Ambien, and Claritin-D. (Tr. 235.)
B. Plaintiff's Hearing Testimony
The ALJ conducted a hearing on May 9, 2002, at which plaintiff was represented by counsel. Plaintiff testified she is a single parent of three children, and she has custody of two of her children ages six and three (their father is currently incarcerated). Plaintiff's sole source of income is from social security disability and food stamps, with medicaid for health expenses. Plaintiff testified that she has no formal schooling past the ninth or tenth grade, but obtained her General Educational Development (GED) equivalency. Plaintiff left high school because she wanted to leave school and begin living in her own apartment. Plaintiff testified she completed a basic bookkeeping and typing course after obtaining her GED. (Tr. 29-30, 39.)
With respect to prior employment, plaintiff last worked for a people locator service as a research analyst from 1991-1993. She was fired from this position for missing too many work days. Plaintiff testified she worked at two different banks, starting as a bank teller and then being promoted to vault teller, for a total of two years. Plaintiff left her employment with the bank because she "needed a change," and went to work as a receptionist for a plastics factory. She was fired from this position due to poor attendance. Regarding her poor attendance record, plaintiff testified she has always had a problem with attendance, and she "did at one point have an alcohol problem and a drug abuse problem that could have been during that time frame...." (Tr. 30-32.)
Plaintiff testified she originally began receiving disability due to a "complete nervous breakdown," and drug and alcohol abuse. Plaintiff was hospitalized twice, the first time between her job at the plastics factory and the people locator service. Upon further questioning, plaintiff testified that her disability was based on substance abuse and bipolar disorder. (Tr. 32-33.)
Plaintiff testified that the first observations of her bipolar disorder were when she was in high school, but she first began psychiatric treatment in 1991. With respect to substance abuse, plaintiff testified she used marijuana, alcohol and cocaine after high school. Plaintiff testified she has been sober for many years (due to detoxification and going to "meetings") and is no longer tempted to use these substances. Plaintiff has not attended Alcoholics Anonymous or Narcotics Anonymous meetings in a number of years, because she felt uncomfortable at the meetings and no longer had a desire "to use." (Tr. 33-36.)
Plaintiff has been under the care of the same treating psychiatrist, Dr. Bun Tee Co, since 1991. Plaintiff testified Dr. Co has diagnosed her with bipolar disorder and major recurring depression. Plaintiff *867 testified she takes medications for her mental health conditions, and sees Dr. Co once a month, for approximately fifteen minutes. Plaintiff testified her appointments with Dr. Co mostly focus on her medications and side-effects and that, when she discussed her concern about losing disability benefits, Dr. Co told her something along the lines of her not needing to work. Plaintiff's medications include Celexa for depression, Xanax for anxiety, and Ambien for sleep. Plaintiff testified she experiences panic attacks when she is around people or in public situations. Plaintiff's anxiety also manifests itself in a sense of worry about "everything." Past treatment prescriptions have included Lithium (discontinued because it made plaintiff ill), Depakote[14] (discontinued because plaintiff "couldn't function the next day"), Effexor (discontinued because it made plaintiff sick to her stomach), Prozac[15] (discontinued because plaintiff had difficulty sleeping), and Paxil (unknown). Plaintiff saw a therapist for a period of time to work through some "childhood issues," but is not currently seeing a therapist for treatment. (Tr. 34-38, 48.)
Plaintiff testified she has mood swings where she is happy, sad, angry, or depressed for no reason at all. Plaintiff testified that her "mood swings" have not improved. Plaintiff often feels overwhelmed and like her "mind is racing a thousand miles an hour...." Plaintiff has experienced these racing thoughts when she is engaging in housework. Plaintiff testified the racing thoughts can last for a few days, and it resolves on its own. Regarding her depression, plaintiff testified that when she is feeling depressed she prays, sleeps, and has her mother or a friend around for assistance. She has not contacted a physician or gone to a hospital during one of these depressive incidents. Plaintiff testified that she has crying spells on a frequent basis. (Tr. 45-47, 50.)
With respect to activities of daily living, plaintiff testified her mornings begin by getting her daughters ready for school and day care, respectively. Plaintiff further testified she is responsible for all household chores and meal preparation. Plaintiff testified she needs assistance from her mother in accomplishing her daily activities, because she has difficulty getting focused and her house has a lot of clutter. Plaintiff does not have a driver's license, relying on her mother for transportation. Plaintiff testified she has difficulty grocery shopping due to anxiety attacks in public and feeling like she is "going to pass out." Plaintiff attempts to avoid these difficulties by taking medication and telling herself "it's really not a big deal" and that she "can control it...." She goes grocery shopping approximately once a week or once every two weeks, for about one hour. (Tr. 39-42, 49.)
Besides grocery shopping, plaintiff testified she visited a friend the previous summer, and went to church a few times. However, she stopped going to church after experiencing a panic attack. Plaintiff testified she does not visit regularly with relatives or engage in any social activities. Plaintiff testified all three of her siblings are on disability for mental illness. Plaintiff enjoys listening to music, but feels like she hears background noises and will miss something if she is listening to music. Plaintiff says she cannot focus on television *868 programs or reading. Plaintiff testified she does not like to talk on the telephone, because she does not like talking or socializing. (Tr. 43-45, 51.)
Plaintiff receives assistance from a "support worker" through the Mental Health Association. This support worker conducts follow-up with plaintiff and is available for transportation assistance, but plaintiff does not partake in such assistance because she does not feel comfortable with her support worker. (Tr. 47.)
C. Vocational Expert's Testimony
James E. Israel testified as a Vocational Expert (V.E.).[16] The V.E. has fifteen years experience as a vocational rehabilitation counselor, and ten years experience working as a Social Security V.E. He testified that manic depression, by itself, will not prevent someone from engaging in substantial, gainful employment, and that there are many people similarly diagnosed who work. The V.E. testified that mood swings are generally the biggest reason manic depressives do not work, because these mood swings may manifest themselves in infrequent attendance, loss of focus, poor stress tolerance, social withdrawal, and the inability to get along well with others. (Tr. 52-55.)
The ALJ asked the V.E. what jobs someone could perform who was plaintiff's age, had her education and job experience, had no exertional limitations, and whose condition is under some level of control, but nonetheless should avoid stressful work situations. The V.E. testified that this hypothetical claimant could engage in work as a cashier (approximately 20,000 jobs in the relevant area), an order clerk (3,500), sales counter clerk (5,500), and stock handlers, baggers (5,500). In response to the ALJ's questioning, the V.E. testified that a person whose manic depression is under some level of control also could potentially work in a janitorial or cleaning position, depending on the stress level and number of rules. (Tr. 55-56.)
The ALJ then asked the V.E. the following hypothetical:
Now, if I were to credit Ms. Brewster's testimony about the mood swings that, and primarily it seems she's having more depressive episodes, there's crying spells where she'll cry all the day, there's days that go by where all, she doesn't get out of bed, she just wants to sleep all day, she indicates that in addition to the problem with the manic depression, she has an anxiety disorder that's showing itself with panic attacks, she has problems being around groups of people, if she does, it gets to the point where she has problems focusing and functioning and feels that she's not a part of what's going on. If I were to credit her testimony with respect to these aspects of what she's said, would she be able to function on any of these jobs that you've mentioned that people who have these disorders can function on if there's some level of control?
The V.E. testified that, under this hypothetical, "[t]he achievement of the effect would be such a highly dysfunctional individual that they couldn't cope even with the most mundane, rudimentary tasks at work. No jobs." The V.E. further testified that problems dealing with the public would eliminate cashiering jobs and sales clerk jobs, but that stocker, bagger, and janitorial positions require less interpersonal skills, even though many still require contact with the public. (Tr. 56-58.)
*869 D. The ALJ's Decision
In a December 16, 2002, decision denying the reinstatement of benefits, the ALJ determined plaintiff experienced medical improvement related to work, and is no longer disabled within the meaning of the Act. The ALJ noted plaintiff was deemed disabled on November 2, 1993. In February 1997, another ALJ determined that plaintiff's disability continued, despite the Commissioner's finding that her disability had ceased.
Plaintiff's case was again reviewed, with the Commissioner finding plaintiff was no longer disabled as of March 2001, and no longer entitled to a period of benefits. (Tr. 15.) To determine plaintiff's disability status, the ALJ adverted to Social Security regulations 20 C.F.R. § 404.1594 detailing the sequential evaluation process for determining continued benefits eligibility. The ALJ found plaintiff has experienced medical improvement, because medical evidence indicates she does not have active, current bipolar disorder, she is no longer using drugs or alcohol, she has not required any mental health hospitalizations, and she does not experience continued mood swings, racing thoughts, or observable anxiety. The ALJ further found plaintiff's medical improvement was related to her ability to work, because her RFC has improved since the comparison point decision. (Tr. 17-18.)
At reconsideration, the Commissioner found that plaintiff did not have a severe impairment as defined by SSA regulations. The ALJ, however, found that "due to the claimant's long history of mental illness, this Administrative Law Judge finds that her mental impairment is a severe impairment as defined in Social Security Ruling 85-28 since the claimant has more than a slight abnormality having more than a minimal effect on her ability to work." (Tr. 18-19.)
The ALJ next determined plaintiff's RFC, first determining plaintiff's credibility. Referring to SSA Ruling 6-7p and Polaski v. Heckler, 739 F.2d 1320 (8th Cir.1984), the ALJ noted that plaintiff's mother testified before a Disability Hearing Officer that plaintiff does "not have male friends or closeness to a man." The ALJ also referenced plaintiff's testimony that she does not like to be around people, but she made numerous references to a "boyfriend" in treatment records. With respect to treatment records, the ALJ noted that records from her treating physician do not evidence "the extremely severe degree of dysfunction" plaintiff alleged. Moreover, the ALJ found that the consultative examination failed to support plaintiff's alleged severity of symptoms. (Tr. 19-21.)
The ALJ ultimately concluded that
[w]hile finding that the claimant has symptoms significantly limiting her ability to work, the allegations of symptoms precluding all types of work are not consistent with the evidence as a whole and are not credible. Due to her mental illness, she is limited to simple, unskilled, low stress work. Her mental illness is not going to allow her to perform complex or highly stressful work. She has a mental illness but it is no longer completely debilitating. The treatment records show that she has not been severely impaired for years. She has some problems but they are mild to moderate rather than severe. In addition to being supported by years of treatment notes and long time treating psychiatrist's assessment that the claimant did not have a problem with her daily activities, social functioning, or concentration, persistence or pace, this assessment is consistent with the consultative examiner's mental status examination, which was basically normal, the *870 GAF score of 70 and his statement that she appeared to have a moderate depression. The claimant has no exertional limitations on her ability to work.
The ALJ noted that the consultative examiner found plaintiff had only a fair capacity to engage in certain work-related activities. However, he accorded these findings little weight, because they were not supported by the treating psychiatrist's notes, or the consulting examiner's mental status examination and GAF score. (Tr. 21.)
The ALJ determined plaintiff would not be able to return to her past, relevant work, finding the Commissioner met his burden to show she can perform a sufficient number of other jobs in the national economy. Adverting to the Medical Vocational Guidelines, the ALJ found plaintiff can engage in simple, unskilled, low-stress work, and that unskilled work, as defined in SSA regulations, requires little judgment, and limited ability to closely attend to tasks and deal with the public. Referring to the V.E.'s testimony, the ALJ noted that he testified that many manic depressives are able to work, and that these individuals can perform work as a cashier, an order clerk, a stock handler and bagger, and a janitor. The ALJ did not consider the identified sales, counter clerk positions, "because they may involve pressure to perform." Moreover, the ALJ suggested that plaintiff obtain vocation counseling to transition back into the workforce, after being out of work for almost a decade. (Tr. 21-22.)
The Appeals Council declined further review. Hence, the ALJ's decision became the final decision of the defendant Commissioner subject to judicial review. (Tr. 5-7.)
In her appeal to this court, plaintiff argues that (1) the ALJ failed to determine properly plaintiff's credibility; (2) the ALJ failed to make a correct RFC determination; and (3) the ALJ did not accord proper weight to the opinions of the consulting examiner. (Doc. 19 at 9-15.)

II. DISCUSSION
A. General legal framework
The court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir.2002). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id.; accord Jones v. Barnhart, 335 F.3d 697, 698 (8th Cir.2003). In determining whether the evidence is substantial, the court must consider evidence that detracts from, as well as supports, the Commissioner's decision. See Brosnahan v. Barnhart, 336 F.3d 671, 675 (8th Cir.2003). So long as substantial evidence supports the final decision, the court may not reverse merely because opposing substantial evidence exists in the record or because the court would have decided the case differently. See Krogmeier, 294 F.3d at 1022.
Social Security regulations provide an eight step sequential evaluation process for reviewing whether a disability recipient is entitled to continued benefits. Paraphrased as follows, these steps are:
(1) Is the individual engaged in substantial, gainful activity?
(2) If the individual is not engaged in substantial, gainful activity, does he have an impairment or combination of impairments meeting or equaling the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1?
(3) If the individual does not have an impairment meeting or equaling a *871 listing, has there been medical improvement in his condition?
(4) If there has been medical improvement, is it related to the individual's ability to do work?
(5) If the individual has no medical improvement or if the medical improvement is not related to his ability to work, do any of the exceptions noted in 20 C.F.R. § 404.1594(d), (e) apply? If none of them apply, the individual's disability will be found to continue.
(6) If medical improvement is shown to be related to the individual's ability to do work or if one of the first group of exceptions applies, are the individual's current impairments severe?
(7) If the individual's impairments are severe, can he engage in past, relevant work?
(8) If the individual cannot engage in past, relevant work, can he engage in other work in the national economy?
20 C.F.R. §§ 404.1594(f), 416.994(f).
B. The ALJ's Credibility Determination
In her appeal to this court, plaintiff argues that the ALJ did not fully explore the requisite factors in Polaski, and that he failed to adequately discuss her medication history.
Assessing a claimant's credibility is primarily the ALJ's function. See Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir.2003) (finding a claimant's credibility is primarily a matter for the ALJ to decide); Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir.2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."). An ALJ's credibility decision must be supported by substantial evidence. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir.2005) ("[W]e defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence."); Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir.2003).
The Eighth Circuit prescribed factors in Polaski, 739 F.2d at 1322, for the ALJ to consider when making a credibility determination. The factors include, in part, observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. Id. Moreover, "[t]he ALJ may discount subjective complaints of physical and mental health problems that are inconsistent with medical reports, daily activities, and other such evidence." Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir.1997); Haynes v. Shalala, 26 F.3d 812, 814-15 (8th Cir.1994).
In support for her position, plaintiff places great emphasis on the ALJ's statement that Dr. Co's September 22, 2001, treatment note indicated plaintiff had not been taking any anti-depressant. Plaintiff suggests that this statement evidences that the ALJ mischaracterized plaintiff's medication history, because she had been taking various anti-depressants for a number of years. The court disagrees. The ALJ's statement accurately reflects what Dr. Co recorded in his treatment note that plaintiff "had not been on any antidepressant." Reading Dr. Co's record in full context, it appears she was not on any anti-depressant at that visit because she could not tolerate Effexor. Effexor was then discontinued, and replaced with Celexa.
*872 While the ALJ's statement may appear to suggest he did not believe she was taking any anti-depressant at all until September 2001, in the context of the record from that date and the entire record in evidence, it is clear that is not the case. Nowhere in the opinion does the ALJ reference this statement to infer plaintiff did not need any anti-depressant until September 2001, nor did the ALJ use this specific statement solely, or with great weight and deference, to buttress his credibility determination. The ALJ is not required to detail every piece of evidence, and a failure to cite plaintiff's full medication history does not mean it was not considered. Wheeler v. Apfel, 224 F.3d 891, 895 n. 3 (8th Cir.2000); Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998) ("[A]n ALJ is not required to discuss every piece of evidence submitted. An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered....") (internal citations omitted).
Similarly, the court finds the ALJ made an adequate credibility determination based on substantial evidence of record. The ALJ referenced social security regulations 20 C.F.R. §§ 404.1529, 416.927 and the Polaski factors in making his determination. The ALJ noted that the observations of plaintiff's mother corroborated plaintiff's allegations, and that if all plaintiff's allegations were credible, then she would be prevented from engaging in substantial, gainful employment. He did not, however, restate all of plaintiff's allegations, choosing instead to reference her allegations as set forth in the record and the testimony. While the ALJ could have more artfully drafted his opinion to include plaintiff's allegations, by adverting to the record, the ALJ indicated he was aware of all plaintiff's allegations, and merely found it "not necessary to resummarize [sic] the claimant's allegations on the 96-7p and Polaski factors." (Tr. 19.) The court does not find the ALJ failed to adequately assess plaintiff's credibility in making this drafting decision, nor that it would have altered his decision. See McGinnis v. Chater, 74 F.3d 873, 875 (8th Cir.1996) (noting that asserted errors in opinion-writing do not require a reversal if the error has no effect on the outcome).
In support of his decision, the ALJ noted that Dr. Co's treatment records indicate plaintiff was not severely depressed, her statements were relevant, logical, coherent and sequential, she was appropriately dressed and groomed, and on at least one occasion, plaintiff reported feeling "much better." The ALJ also referred to Dr. Rexroat's evaluation. Dr. Rexroat noted plaintiff was appropriately dressed and groomed, was not suspicious, anxious, tense, shaky or tremulous, she had normal affect and responsiveness, she was alert, she had a normal level of energy, her speech was normal, coherent and relevant, and she had a GAF of 70. The ALJ further noted that plaintiff described to Dr. Rexroat significant symptoms of depression, and he assessed she had moderate depression.
With respect to plaintiff's allegations, she reports being unable to engage in any employment, that she experiences mood swings, that she no longer cares about personal grooming, that she does not participate in any activities, and that she has difficulty with concentration, memory and crying spells. Plaintiff further reports that she is able to engage in household chores, but needs assistance when she is "real depressed." Plaintiff stated that she does not like to leave her home or be in the company of other people.
Medical records indicate plaintiff's depression is not as severe as she reports, and is controlled with medication. See Estes v. Barnhart, 275 F.3d 722, 725 (8th *873 Cir.2002) ("An impairment which can be controlled by treatment or medication is not considered disabling."); Stout v. Shalala, 988 F.2d 853, 855 (8th Cir.1993) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling."). Moreover, plaintiff proffers inconsistent statements related to side-effects from the medications Xanax, Serozone, and Ambien. In her 2000 claimant questionnaire, plaintiff failed to report any side-effects from her medications. In her 2001 questionnaire, she reported side-effects to include fatigue and headaches, and reported taking the same medications as she did when completing her 2000 questionnaire.
Her reports of side effects from taking these medications are belied by Dr. Co's medical records noting few reports of side-effects, and discontinuing prescriptions the few times plaintiff reported side-effects. Additionally, plaintiff reports failing to attend to personal grooming; however, reports from both Dr. Co and Dr. Rexroat note she is well-dressed and groomed. Plaintiff also reports the inability to engage in personal relationships and not wanting to be around others. The ALJ noted, however, that she was able to have a boyfriend for a period of time. See Ply v. Massanari, 251 F.3d 777, 779 (8th Cir.2001) (noting a claimant's inconsistent statements as a factor to consider in determining claimant's credibility).
By her own admission, plaintiff is able to engage in household chores, with some assistance necessary when she is very depressed. She is the principal care giver for her two minor children, and there is no evidence in the record suggesting she is unable to properly care for her children. See Pena v. Chater, 76 F.3d 906, 908 (8th Cir.1996) (affirming ALJ's discount of claimant's subjective complaints of pain where claimant was able to care for one of his children on daily basis, drive car infrequently, and go grocery shopping occasionally).
While the ALJ did not specifically discredit plaintiff's mother's corroborating accounts, the failure to do so is not a defect requiring remand. Lorenzen v. Chater, 71 F.3d 316, 319 (8th Cir.1995) ("[A]lthough the ALJ failed to list specific reasons for discrediting the testimony of [a witness], it is evident that most of her testimony concerning [plaintiff]'s capabilities was discredited by the same evidence that discredits [his] own testimony concerning his limitations."); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir.1992).
There is some evidence in the record to support plaintiff's allegations of uncontrolled severe depression and anxiety disorder, beyond her subjective complaints and her mother's testimony. This evidence is not, however, so overwhelming as to negate the substantial, contrary evidence the ALJ relied upon in forming his decision. Moreover, it is not the province of this court to re-weigh the evidence as it existed before the ALJ. See Krogmeier, 294 F.3d at 1022 (stating as long as there is substantial evidence in the record, the ALJ's decision will be upheld even if substantial evidence exists adverse to the ALJ's findings); cf. Orrick v. Sullivan, 966 F.2d 368, 372 (8th Cir.1992) (quoting Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir.1992)) (quoting Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir.1987) ("No one, including the ALJ, disputes that plaintiff has pain.... The question is `whether she is fully credible when she claims that her back hurts so much that it prevents her from engaging in her prior work.'")); Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir.1990) ("ALJs must seriously consider a claimant's testimony about pain, even when ... subjective. But questions of credibility are for *874 the trier of fact in the first instance. If an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, we will normally defer to that judgment.").
Taking all of these factors into consideration, as the ALJ did in this case, there is substantial evidence on the record for the ALJ to find plaintiff is not fully credible in her allegations of severe mental impairment preventing all substantial, gainful activity.
C. The ALJ's RFC Determination
Plaintiff argues the ALJ's RFC determination is inadequate, because he failed to make a function-by-function assessment of plaintiff's stress-tolerance, stating only that she was limited to "low-stress" work. Relatedly, plaintiff argues that the ALJ failed to accord proper weight to the opinion of the consulting examiner Dr. Rexroat, in favor of treating provider Dr. Co. The court disagrees.
The RFC "is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." S.S.R. 96-8p, 1996 WL 374184, at *3 (Soc. Sec. Admin. July 2, 1996). The determination of residual functional capacity is a medical issue, Singh v. Apfel, 222 F.3d 448, 451 (8th Cir.2000), which requires the consideration of supporting evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir.2001) "In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional." Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir.2003).
Plaintiff argues that the ALJ's use of the phrase "low stress," particularly in his hypothetical to the V.E., is inadequate. A hypothetical question to a V.E. must precisely describe a claimant's impairments so that the V.E. may accurately assess whether jobs exist for the claimant. Newton v. Chater, 92 F.3d 688, 694-95 (8th Cir.1996); see Pierce v. Apfel, 173 F.3d 704, 707 (8th Cir.1999); Totz v. Sullivan, 961 F.2d 727, 730 (8th Cir.1992). It "must capture the concrete consequences of claimant's deficiencies." Pickney v. Chater, 96 F.3d 294, 297 (8th Cir.1996).
Had the ALJ simply hypothesized to the V.E. that plaintiff needed low stress work, without more, then plaintiff's argument would be more persuasive. The ALJ, however, did not rely solely on this characterization, but specifically asked the V.E. about the ability of manic depressives to engage in competitive employment, the symptoms that may prevent someone with manic depression from engaging in substantial, gainful employment, a manic depressive's poor stress tolerance and social withdrawal, a manic depressive's ability to get along with others in a work environment, and what part medication control has on the ability to work. Moreover, the V.E. noted he had extensive experience with respect to manic depressives and vocation.
In his ultimate hypothetical, the ALJ asked the V.E. to consider a manic depressive who is under some level of control, with the same age, education, and work background as plaintiff, and who should avoid stressful work situations. The V.E. clearly identified the fact that all work situations are stressful to some extent, and that if the individual is under some level of control, then she can perform an array of positions as a janitor, stock handler, bagger, order clerk, sales counter clerk, or cashier. Moreover, in follow-up questioning, the ALJ asked the V.E. to opine about the jobs he identified as they relate to plaintiff having difficulties dealing with the public. The V.E. then noted what positions would be most appropriate in this *875 regard. In his opinion, the ALJ discounted any positions identified by the V.E. as a sales counter clerk, "because they may involve pressure to perform."
Plaintiff cites case law in support of her opinion that the ALJ's reference to "low stress" was not precise enough for an RFC determination. In Lancellotta v. Sec'y of Health and Human Servs., 806 F.2d 284 (1st Cir.1986), the court reversed and remanded the decision denying benefits, because "[t]he ALJ made no findings on the nature of Lancellotta's stress, the circumstances that trigger it, or how those factors affect his ability to work." Id. at 285. The ALJ in Lancellotta determined plaintiff could engage in low-stress activity, despite the fact that the medical consultant opined that plaintiff could engage in only non-stress work, made no effort to inquire as to Lancellotta's ability to perform work-related activities, and did not qualify his hypothetical to the V.E. with anything other than that Lancellotta was limited to low-stress, sedentary work. Id. at 285-86. The V.E. ultimately concluded that there were up to 200,000 jobs in the low-stress, sedentary category. Id. at 285.
The instant case is distinguishable, given that the ALJ did not simply ask the V.E. to identify low-stress employment, but discussed with the V.E. at length plaintiff's manic depression and potential difficulties dealing with the public. In response, the V.E. did not merely posit low-stress positions, but identified positions that someone who suffers from manic depression, under some level of control, and with problems dealing with the public could perform.
Accordingly, the ALJ's reference to low-stress work, in combination with the V.E.'s testimony was proper, and the ALJ relied on the V.E.'s opinion appropriately. See Fenton v. Apfel, 149 F.3d 907, 911 (8th Cir.1998) (an ALJ must look to V.E. testimony to make an RFC determination when plaintiff's non-exertional impairments limit her ability to perform a full array of work in a certain category); Lincoln v. Halter, 145 F.Supp.2d 1086, 1095-96 (E.D.Mo.2001).
Turning to the weight afforded medical opinions, plaintiff argues that Dr. Rexroat, as the consulting examiner, is a "specialist source familiar with Social Security regulations and ... had the opportunity to review Plaintiff's treatment notes." Therefore, his assessment should have been given greater weight and not be discounted based on the ALJ's personal interpretation of his assessment, plaintiff's GAF score, and any apparent inconsistency with the treating provider's (Dr. Co) assessment.
A treating physician's opinion normally is entitled to substantial weight. Dixon, 353 F.3d at 606. Regardless of how much weight the ALJ affords a treating physician's opinion, however, the ALJ must "always give good reasons" for the weight given. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p, 1996 WL 374188, at *5 (SSA July 2, 1996). Although a treating provider is accorded substantial weight, the ALJ must still consider the record as a whole. Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir.1996). "Further, where the treating physician's opinions are themselves inconsistent, they should be accorded less deference." Id. at 1325.
In contrast, "[a] one-time evaluation by a non-treating psychologist is not entitled to controlling weight." Clark v. Apfel, 141 F.3d 1253, 1256 (8th Cir.1998). Moreover, an ALJ is only required to craft his hypothetical and make an RFC determination based on impairments he finds credible and supported by substantial evidence. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir.2003) ("The ALJ properly limited his RFC determination to *876 only the impairments and limitations he found to be credible based on his evaluations of the entire record."); Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir.1995).
Dr. Rexroat is a non-treating provider who conducted a one time examination. In his opinion, the ALJ specifically noted these findings, and found them to be inconsistent with other evidence of record. Plaintiff argues in doing this the ALJ substituted his own opinion for that of Dr. Rexroat. The ALJ is responsible for determining plaintiff's RFC based on all the evidence of record, which must include at least some medical opinion. See Stormo v. Barnhart, 377 F.3d 801, 807 (8th Cir.2004). In doing so, the ALJ must evaluate the evidence, including the consistency of, and weight afforded, medical opinions.
The ALJ did not, as plaintiff suggests, rely in error on Dr. Rexroat's GAF assessment. "The GAF scale is used by clinicians to report an individual's overall level of functioning. See American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th ed.2000)." Quaite v. Barnhart, 312 F.Supp.2d 1195, 1200 (E.D.Mo.2004). "While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy." Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir.2002); cf. Hamilton v. Barnhart, 355 F.Supp.2d 991, 998 (E.D.Mo.2005) (acknowledging GAF score as a factor to consider in evaluating an examining, non-treating provider's assessment); Matney v. Apfel, 48 F.Supp.2d 897, 904 (W.D.Mo.1998) (discounting provider's medical opinion, based partly on inconsistency with the provider's assessed GAF score).
The ALJ did not reference Dr. Rexroat's GAF assessment of mild symptoms in an effort to show plaintiff is able to work, or as the only evidence of record to discredit portions of Dr. Rexroat's functional assessment. The ALJ looked to a body of evidence including Dr. Rexroat's status as an examining, non-treating provider, his GAF assessment, his failure to identify plaintiff as having no useful ability to function (a poor rating), his examination supporting only moderate depression, and his assessment that plaintiff has no significant symptoms related to anxiety, no deficiencies in concentration, persistence and pace and only mild limitations in activities of daily living. The ALJ's full review of the record and effort to explain the weight afforded Dr. Rexroat's treatment simply does not reflect his own interpretation of the medical evidence, or a failure to buttress his conclusion with substantial evidence of record.
Additionally, the ALJ based his decision on Dr. Rexroat's opinion as compared to plaintiff's long time treating psychiatrist Dr. Co. The record contains multiple treatment records spanning many years, and detailing plaintiff's treatment history with Dr. Co. These treatment records do not evidence any significant functional or social limitations, and consistently establish plaintiff was not severely depressed. In his evaluation, Dr. Co. determined plaintiff had no functional limitations with respect to restrictions of daily activities, the ability to maintain social functioning, or concentration, persistence or pace. Moreover, Dr. Co. noted that while plaintiff does exhibit a flat affect and dysphoria, plaintiff's response to pharmacotherapy and supportive psychotherapy was "good," she was appropriately dressed and groomed, she had intact memory and intellect, and she was treatment compliant. While not dispositive, Dr. Co's findings are further supported by non-examining, non-treating provider Dr. Bailey's observations that plaintiff had only a mild degree of *877 limitation with respect to activities of daily living, difficulties maintaining social functioning, and difficulties maintaining concentration, persistence or pace. See Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir.2004) ("[W]e do not consider the opinions of non-examining, consulting physicians standing alone to be `substantial evidence.'"); Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir.1999) (opinion of a consulting physician who does not examine the claimant does not ordinarily constitute substantial evidence).
Arguably, Dr. Rexroat's medical assessment provides a more specific evaluation of plaintiff's abilities. This, of itself, does not belie the total evidence establishing plaintiff's response to treatment and the treating provider's failure to note restrictions similar to Dr. Rexroat's. As the ALJ noted, the treating provider's opinion is entitled to substantial consideration and, in this case, the record does not indicate the ALJ gave insufficient consideration to the treatment provider's opinion. See Dixon, 353 F.3d at 606 ("[M]edical opinions must be supported by acceptable medical evidence and must not be inconsistent with other evidence on the record as a whole.").
For these reasons, the final decision of the Commissioner is affirmed in accordance with this Memorandum. An appropriate order shall issue herewith.

ORDER
In accordance with the Memorandum filed herewith,
IT IS HEREBY ORDERED that the decision of the Commissioner of Social Security is affirmed. The action is dismissed with prejudice.
NOTES
[1] Plaintiff does not argue the ALJ erred in determining she experienced medical improvement; therefore, the court will only briefly discuss plaintiff's medical records dated up to and including 1997.
[2] A GAF of 50 indicates "[s]erious symptoms ... or any serious impairment in social, occupational, or school functioning...." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR), 34 (Text Revision 4th ed.2000).
[3] Serzone "is indicated for the treatment of depression." Physician's Desk Reference (P.D.R.) 1019 (55th ed.2001).
[4] "Ambien ... is indicated for the short-term treatment of insomnia." Id. at 2974.
[5] Alprazolam, more commonly referred to as Xanax, is "indicated for the management of anxiety disorder ... of the short-term relief of symptoms or anxiety." Id. at 2650.
[6] "Effexor ... is indicated for the treatment of depression." Id. at 3361.
[7] A GAF of 70 typically indicates "[s]ome mild symptoms ... or some difficulty in social, occupational, or school functioning..., but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR), 34 (Text Revision 4th ed.2000).
[8] Wellbutrin "is indicated for the treatment of depression." P.D.R. at 1486.
[9] "Paxil ... is indicated for the treatment of depression." Id. at 315.
[10] "Sonata is indicated for the short-term treatment of insomnia." Id. at 3451.
[11] "Celexa ... is indicated for the treatment of depression." Id. at 1258.
[12] The exact name of this medication is unknown as the handwritten record is difficult to read.
[13] Claritin-D is "indicated for the relief of symptoms of seasonal allergic rhinitis." P.D.R. at 2886.
[14] Depakote "is indicated for the treatment of manic episodes associated with bipolar disorder." Id. at 433.
[15] Prozac is indicated for the treatment of depression. Prozac, at http://www.prozac.com/how_prozac/how_prozac_can_help.jsp?reqNavId =2 (last visited February 23, 2005).
[16] A review of the record did not reveal the V.E.'s Curriculum Vitae. Neither party, however, appears to dispute his credentials.